85 A.2d 724 (1951)
DU PONT
v.
DU PONT.
No. 1.
Supreme Court of Delaware.
December 26, 1951.
Arthur G. Logan, Stephen E. Hamilton, Jr., and Samuel R. Russell, of Logan, Marvel & Boggs, of Wilmington, for appellant.
James R. Morford and Morton E. Evans, of Morford, Bennethum, Marvel & Cooch, of Wilmington, for appellee.
WOLCOTT and TUNNELL, Justices, and TERRY, Judge, sitting.
*726 WOLCOTT, Justice.
In so far as it is necessary to determine the question before us, the facts[1] are that the appellant and appellee were married and thereafter the appellant deserted the appellee, leaving her in destitute circumstances. Thereupon, the deserted wife filed an action in the Court of Chancery praying that a decree be entered directing her husband to pay her a periodic sum for her separate maintenance. The husband moved to dismiss the action, asserting that the Court of Chancery was without jurisdiction to hear the cause. The motion thus made was denied by the Chancellor, from which denial this appeal is taken.
After the argument on the appeal the Court raised on its own motion a basic constitutional question. We have since had the benefit of the views of counsel and will first dispose of the question thus raised.
Briefly stated, the question posed is this: Is the grant to the Court of Chancery by Section 10 of Article IV of the Constitution of 1897 of "all the jurisdiction and powers vested by the laws of this state in the Court of Chancery" subject to unrestricted legislative curtailment by reason of the inclusion in Article IV of Sections 17 and 18?[2] The point is important in this *727 cause since 45 Laws of Del. Ch. 241, purports to confer exclusive jurisdiction over non-support actions between husband and wife on the Family Court of New Castle County.
Section 17 provides in part that "The General Assembly, notwithstanding anything contained in this Article, shall have power to repeal or alter any Act of the General Assembly giving jurisdiction to * * * the Court of Chancery * * *. [And that it] shall also have power to confer upon * * * the Court of Chancery jurisdiction and powers in addition to those hereinbefore mentioned. * * *"
Section 18 provides in part that "Until the General Assembly shall otherwise provide, the Chancellor and the Vice-Chancellor or Vice-Chancellors, respectively, shall exercise all the powers which any law of this State vests in the Chancellor, besides the general powers of the Court of Chancery, * * *."
It is suggested that the question raised does not find its answer in Glanding v. Industrial Trust Co., 28 Del. Ch. 499, 45 A.2d 553, for the reason that that case did not hold that the Legislature was without authority by express legislative enactment to divest the Court of Chancery of jurisdiction unless at the same time it established a sufficient remedy in some other tribunal.
The majority in the Glanding case held that no such divestment would result unless the Legislature expressly declared the new remedy to be exclusive. However, it is technically correct to say that in the Glanding case the Court did not have before it the question of whether the Legislature could expressly deprive Chancery of jurisdiction without at the same time creating a sufficient remedy in some other tribunal because the other remedy was admittedly sufficient in that case. The underlying implications in both the majority and minority opinions, however, are to the contrary and were recognized as such in the opinion in this cause below Del. Ch., 79 A.2d 680 and in Delaware Trust Co. v. McCune, Del. Ch., 80 A.2d 507. Nevertheless, in view of the technical fact that the precise question was not before the Court in the Glanding case, we have concluded it is advisable to reconsider it.
It may be observed that no one denies that the general equity jurisdiction of the Court of Chancery, established originally by Sections 21 and 25 of a Colonial Act of 1726-1736[3], is defined as all the general equity jurisdiction of the High Court of Chancery of Great Britain as it existed prior to the separation of the colonies, subject to the proviso, originally contained in Section 25 of the Colonial Act and now found as Section 4367, R.C. 1935, to the effect that the Chancellor shall not hear and determine any cause where a sufficient remedy exists at law. This is a holding of the Glanding case which we consider binding upon us. We have before us, therefore, in this phase of the appeal solely the question of the power of the Legislature to interfere with that jurisdiction by reason of the authority contained in Sections 17 and 18 of Article IV of the Constitution.
Initially we will dispose of Section 18. It is obvious that this section applies only to the powers of the office of Chancellor in contradistinction to the general equity powers of the Court of Chancery, since it specifically refers to powers vested "in the Chancellor". There are many powers conferred by statute upon the Chancellor directly which are distinct from the general equity powers to be exercised by the Chancellor as a Judge of the Court of Chancery.[4] We think, therefore, that Section *728 18 refers only to powers and authority incident to the office of Chanceller. Section 18, therefore, has no pertinency to the question before us.
The contention that Section 17 authorizes the Legislature to reduce the jurisdiction of the Court of Chancery by the passage of a law expressly taking such jurisdiction from it requires more detailed treatment, and a consideration of the relation between Sections 10 and 17.
We think it fundamental in our theory of constitutional government that the basic purpose of a written constitution has a two-fold aspect, first, the securing to the people of certain unchangeable rights and remedies, and, second, the curtailment of unrestricted governmental activity within certain defined fields. Bearing this in mind, the presumption easily follows that when a written constitution provides for the separation of the powers of government between three major branches, it is intended that within the scope of their constitutionally conferred fields of activity the three separate departments of government are to be independent, subject, of course, to any limitations upon this presumption found in clear and express provisions of the constitution, itself. Obviously, no presumption springing from theory may be permitted to override the clear meaning of the written document from which it is drawn.
It is to be noted that Section 10 confers upon the Court of Chancery all the jurisdiction "vested by the laws of this State" in it, while Section 17 authorizes the Legislature to alter or repeal "any Act of the General Assembly giving jurisdiction" to the Court of Chancery. The decided difference in connotation between the verbs "vest" and "give" become significant in view of the fundamental purpose of written constitutions. This significance is clarified by the history of each section.
The historical development of Section 10 goes back to the Colonial Act of 1726-1736 by which the Judges of the then Courts of Common Pleas in each of the counties were authorized to hold Courts of Chancery under the same system of equity as was administered in the High Court of Chancery of Great Britain. This act, of course, could have been amended or repealed at will by the Colonial General Assembly. This situation continued until the Constitution of 1776 by Article XIII of which it was provided that the Justices of the Courts of Common Pleas should have the power to hold Courts of Chancery "as heretofore, unless the legislature shall otherwise direct". Thus, the Constitution of 1776 did not change the nature of the Courts of Chancery but continued the absolute power of the Legislature over them as it had existed throughout the colonial period.
By the Constitution of 1792, however, the status of the Courts of Chancery was changed. By Section 14 of Article VI of that Constitution, it was provided that "The equity jurisdiction heretofore exercised by the judges of the court of common pleas shall be separated from the common-law jurisdiction, and vested in a chancellor, who shall hold courts of chancery in the several counties of this State. * * *"
In 1792, therefore, for the first time, a separate Court of Chancery was vested with constitutionally defined jurisdiction which could not be disturbed by the Legislature. This is made particularly clear by the absence in the Constitution of 1792 of a counterpart to Section 17 of the present Constitution.
The next step in the historical development of Section 10 occurred in the adoption of the Constitution of 1831 in Section 5 of Article VI of which the language of Section 10 first appears, viz., "The chancellor shall hold the court of chancery. This court shall have all the jurisdiction and powers vested by the laws of this State in the Court of Chancery".
We think the laws vesting jurisdiction referred to in Section 5 of Article VI of the Constitution of 1831 refer obviously and directly to the statutory enactments in effect at the time of the adoption of the Constitution of 1792 which, for the first time, "vested" *729 equity jurisdiction in a court of this state.
In Section 12 of Article VI of the Constitution of 1831 is to be found a provision similar to the first sentence of the present Section 17. What was the purpose of including an authorization to the General Assembly to repeal or alter any act "giving" jurisdiction to the Court of Chancery since equity jurisdiction had been vested in the Court of Chancery and secured from arbitrary legislative action? The answer to this query is, it seems to us, that in the interim between 1792 and 1831, the Legislature by statute had increased the powers of the Chancellor[5] and it was with respect to these enactments that the Legislature was authorized to act.
This situation continued throughout the period 1831 to 1897, the date of adoption of the present constitution. During that interim, the Legislature had continued to confer additional powers upon the Chancellor and the Court of Chancery. The same result obtained, therefore, in 1897 when, in Sections 10 and 17, the constitutional convention re-adopted with respect to the Court of Chancery the same provisions appearing in the Constitution of 1831 except for the addition of a sentence in Section 17 expressly giving the Legislature power to add to Chancery jurisdiction.
The remarks of Judge Spruance before the Convention of 1897, who said the sentence was added "because it was the thought that not merely ought the General Assembly to have the power to alter the laws which have conferred upon these courts under their former names, jurisdiction, but if the Legislature saw fit it ought to have the power of adding to that jurisdiction", can have had reference, therefore, only to laws passed subsequent to 1792.
We conclude, therefore, that Section 17 is not an authorization to the Legislature to restrict Chancery jurisdiction to less than it was in 1792. We think the Constitutions of 1792, 1831 and 1897 intended to establish for the benefit of the people of the state a tribunal to administer the remedies and principles of equity. They secured them for the relief of the people. This conclusion is in complete harmony with the underlying theory of written constitutions. Its result is to establish by the Judiciary Article of the Constitution the irreducible minimum of the judiciary. It secures for the protection of the people an adequate judicial system and removes it from the vagaries of legislative whim.
If the opposite view is carried to its logical conclusion, it would permit the practical abolition of all courts by the action of one Legislature. This would be in direct conflict with the provisions concerning the method of amendment of the constitution and, furthermore, would nullify Section 9 of Article I which provides in part that "All courts shall be open; and every man, for an injury done him * * * shall have remedy by the due course of law, and justice * * * according to * * * the law of the land * * *".
The result, therefore, is that the general equity jurisdiction of the Court of Chancery is measured in terms of the general equity jurisdiction of the High Court of Chancery of Great Britain and is a constitutional grant not subject to legislative curtailment, except in so far as the proviso now found in Section 4367, R.C.1935, but originally found as Section 25 of the Colonial Act of 1726-1736, operates to curtail it.
The proviso is to the effect that the Chancellor shall not hear and determine any cause where a sufficient remedy exists at law. As such, it is both a restriction upon the Chancellor in the exercise of the general equity powers of the Court of Chancery and, at the same time, an implied grant of authority to the Legislature to restrict the Chancellor in the exercise of those powers by the creation of a sufficient remedy in some other tribunal and by making such remedy exclusive to the other tribunal.
When the Legislature under its implied constitutional authority expressly or by necessary implication confers exclusively *730 upon some other tribunal jurisdiction of causes theretofore heard and determined in the Court of Chancery, that of itself will not prevent the Chancellor from acting unless at the same time a remedy is provided in the new tribunal which is the equivalent of the remedy available in the Court of Chancery. This necessarily follows from the conclusion that Section 10 of Article IV is a guarantee to the people of the State that equitable remedies will at all times be available for their protection. This guarantee the Legislature may not ignore.
We think the foregoing answers the question raised by the Court. Our conclusion is that Section 17 does not authorize the Legislature to alter, amend or repeal any part of the jurisdiction of the Court of Chancery conferred upon it by Section 10 of Article IV of the Constitution. Such authority as the Legislature has in that respect arises by implication from the proviso contained in Section 4367, R.C. 1935 which, as we have pointed out, is a part of the constitutional grant of equity jurisdiction to the Court of Chancery.
Having disposed of this question, we turn now to a consideration of the other questions in the case, viz.:
1. Did the Court of Chancery at any time have jurisdiction to decree separate maintenance to a deserted wife?
2. If the Court of Chancery has such jurisdiction, may it be exercised in the instant case?
As far as can be ascertained, the present case is the only instance of an action for separate maintenance having been filed by a wife in the Delaware Court of Chancery. This case does not involve the jurisdiction of Chancery to enforce by way of specific performance a separation agreement between husband and wife. The action seeks only to force the husband to support the wife and the separate maintenance is not sought as an incidental to some other recognized field of equitable jurisdiction.
Since the general equity powers of the Court of Chancery of Delaware are those of the High Court of Chancery of Great Britain prior to the separation, if actions for separate maintenance were maintainable by the wife in England prior to the separation, it follows that the Delaware Court of Chancery has jurisdiction to hear them. We turn, therefore, to a consideration of the English decisions to determine, if possible, whether a deserted and destitute English wife could have obtained relief against her husband in Chancery.
It is impossible to find in the English reports an absolute answer due, in large measure, to the inadequacy of the reporting of the early cases. A number of decisions touch upon the question. Upon analysis, however, it will be found that by far the larger number are cases in which the wife sought a decree for separate maintenance out of her own property which had passed to her husband by reason of the marriage, or were cases in which the wife sought specific enforcement of a separation agreement entered into between them.[6] The case at bar does not fall within either category.
In four other of the reported English decisions[7] it appears at first glance as though separate maintenance per se rather than as an incidental to some recognized subject of equitable relief had been granted. The decrees entered in these cases, however, were entered during the period of the Commonwealth by the Lord Commissioners who were, by their commissions, specifically directed, inter alia, to act in accordance *731 with the ecclesiastical laws,[8] the Ecclesiastical Courts having been suspended after the proclamation of the Commonwealth.[9]
Irrespective, therefore, of whether these decrees entered during the interregnum were decrees for separate maintenance per se or decrees for alimony as an incident to a matrimonial cause formerly heard in the Ecclesiastical Courts, they can scarcely be taken as persuasive authority for the proposition that Equity in England awarded separate maintenance to a deserted wife as an independent form of equitable relief since, as will appear hereafter, a deserted wife could sue in the Ecclesiastical Courts for the equivalent of maintenance.
There are only two English Chancery precedents which may be urged in support of the argument of appellee that it was the practice of the High Court of Chancery of Great Britain to award separate maintenance to a deserted wife other than as an incidental to some other field of equity. The first of these is Lasbrook v. Tyler, 1630-31, 1 Ch.Rep. 42, 21 Eng.Rep. 502. In that case, a decree for an allowance for the maintenance of a wife was entered at the suit of her brother. The case, however, is very meagerly reported and contains a reference to a "bond given before marriage" the benefit of which was given the wife. This reference would seem to indicate that the separate property of the wife was probably involved in the case. If that is so, then its effectiveness as a precedent in support of the appellee's argument is largely destroyed.
The second of the two cases is Colmer v. Colmer, 1729, Moseley 118, 25 Eng.Rep. 304. In that case, a wife sought a decree giving her a separate maintenance allowance out of her husband's estate, he having gone to Maryland after deserting her. Prior to his departure, he settled all his property in trust, making an inadequate provision for the maintenance of his wife. The Lord Chancellor held that while the case could have been brought in the Ecclesiastical Court, it also could be brought in Chancery. Since the husband was required by the common law to support his wife according to his wealth and position, the Chancellor refused to allow him to avoid this obligation by vesting his property in trustees and referred the matter to a Master to determine the proper amount, under the circumstances, for the wife's maintenance until the husband returned to cohabitation.
This case does not constitute persuasive authority in support of the appellee's argument for the reason that it seems apparent that the basis for the taking of jurisdiction was the presence of a trust, an admitted field for equity activity.
The early English cases cited by appellee, at best, support her argument in this respect only by reason of the vagueness of their reports and the doubt thus created as to what precisely was done. However, any doubt thus created is laid at rest by subsequent English decisions purporting to recite the prior practice. These cases are uniform in holding that Chancery never decreed separate maintenance to a deserted wife except as an incidental to some other recognized field of equity jurisdiction.[10] Accordingly, if, by reason of the vagueness of the reports of one or two of the early cases, the state of the early law is doubtful, we think that doubt must be resolved against Chancery having at any time undertaken to award a wife separate maintenance except as an incidental to some recognized field within which equity operated.
Further support for this conclusion is found in the fact that in England, with respect to alimony, the Ecclesiastial Courts of England, by reason of their jurisdiction over all matrimonial causes, were the sole *732 tribunals which granted alimony or separate maintenance to a wife.[11]
Some confusion developed at the argument of this cause by reason of the reference in the reported cases to the word "alimony" rather than "separate maintenance". In substance, however, they seem to have been the same. Alimony is defined in Godolphin's Repertorium Canonicum 508 (1680) as the proportion of the husband's estate which the wife could sue for in the Ecclesiastical Court to be allowed to her for subsistence when separated from her husband for a reason other than her own elopement or adultery.[12]
A deserted wife could seek alimony in the Ecclesiastical Courts in either of two ways. First, by an action for divorce a mensa et thoro, which seems to have been granted when the desertion was accompanied by the cruel treatment of the wife by the husband, or, second, by an action for the restitution of conjugal rights, which seems to have been supported by proof which in modern times would amount to willful desertion by the husband.[13] In either an action for divorce a mensa et thoro or an action for the restitution of conjugal rights, alimony pendente lite was allowed the wife as a matter of course.[14]
An action for the restitution of conjugal rights at the suit of the wife, if sustained by competent proof of willful desertion by the husband, resulted in the entry of a sentence ordering the husband to resume cohabitation with his wife, to treat her kindly, and to pay alimony pendente lite until the prescribed cohabitation had been resumed.[15] When analyzed, it is seen that the sentence was substantially the same as an order for the payment to the wife of a sum for separate maintenance. The husband, at his election, could have resumed cohabitation but that is undoubtedly true in modern usage as well since, in the absence of an application for divorce on the grounds of desertion, a wife, herself, would become the guilty party if, after a bona fide offer to resume cohabitation, she persisted in the separation.[16]
A deserted wife in England, therefore, had available to her in the Ecclesiastical Courts an adequate remedy for the enforcement of her common-law right to support by her husband. The means of enforcement of the Ecclesiastical Court's sentence was by excommunication, which worked certain civil disabilities at common law, and, if the refusal to obey the sentence was persisted in for a space of 40 days after excommunication, upon certification of that fact by the Ecclesiastical Court, a writ de excommunicato capiendo was issued by Chancery, upon which the excommunicant was imprisoned until such time as he had purged himself of his contempt of the ecclesiastical sentence, and the ban of excommunication had been lifted.[17] Even after the offending husband had been imprisoned for his refusal to obey the sentence, the wife still retained control over the enforcement of the sentence entered for her benefit since it was only with her consent that he could be released and purged of his contempt.[18]
At common law, a wife had an absolute right to be maintained by her husband but was limited in her means of enforcing this right to the purchase of necessities upon the credit of the husband, which has been repeatedly recognized as no adequate remedy.[19] *733 This being so, it seems obvious that the refusal of Chancery in England to give relief to a deserted wife by the application of the maxim that Equity will suffer no right to be without a remedy is explained by the existence in the Ecclesiastical Courts of an adequate remedy.
The foregoing indicates the state of the English law with respect to the remedies of a deserted wife at the time Courts of Equity were established by Colonial Act in Delaware. The Colonial Assembly of Delaware, however, when it established Courts of Equity, did not establish Ecclesiastical Courts. This failure disturbed the balance which existed in England between the High Court of Chancery and the Ecclesiastical Courts which complemented each other to afford a means of relief for some causes for which there was no adequate remedy in the law courts. The mutual dependence of these courts is illustrated by the dictum of Lord Coke quoted in Gibson's Codex Juris (1713) at page 967, as follows: "The temporal, and the Ecclesiastical law, are so coupled and interwoven, that the one cannot subsist without the other."
The result of the failure to establish Ecclesiastical Courts in Delaware was to leave a void in the system of jurisprudence which was brought to the colonies along with other English institutions. This being the fact, there can be little doubt but that the ancient maxim that Equity will suffer no right to be without a remedy would have been applied in the Courts of Equity of Delaware to give a deserted wife separate maintenance, which she could have had in England in the Ecclesiastical Court but could have in Delaware only in a Court of Equity. After the passage of the Act of 1726-1736, therefore, the Courts of Equity of Delaware had jurisdiction to award separate maintenance to a deserted wife as a part of their original general jurisdiction growing out of the maxim that Equity will suffer no right to be without a remedy.[20]
It must be borne in mind that in so doing the Delaware Courts of Equity would not have been assuming to themselves the Ecclesiastical Court's jurisdiction over all matrimonial causes, which was based directly upon the spiritual and churchly aspects of the marriage relationship. The award of separate maintenance to a deserted and destitute wife by a Court of Equity constitutes nothing more than a fulfillment of Equity's historic function, the giving of a remedy for a legal right which otherwise was remediless. The right of a wife to maintenance is not a spiritual right  it is a right secured to her by the common law, irrespective of the spiritual aspects of the marriage relationship. Since it is a purely legal right, it may be enforced in Equity as may any other legal right which lacks redress at law.
Commencing, therefore, at some time between the years 1726 and 1736, the Delaware Courts of Equity, as a part of their original jurisdiction inherited from the High Court of Chancery of Great Britain, could have, at the suit of a distressed wife, entered a decree for separate maintenance and enforced that decree with all of the powers Courts of Equity have for compelling compliance with their decrees.
The appellant does not contend that the passage of the first non-support act in 1887, 18 Del.Laws, c. 230, affected the jurisdiction of the Court of Chancery over this subject matter. He does contend, however, that by the passage of 45 Laws of Delaware, Chapter 241, the Legislature created an expressly exclusive and sufficient remedy for a deserted wife in another tribunal, and that, thereby, the Court of Chancery was deprived of its jurisdiction to entertain actions by deserted wives for separate maintenance.
*734 Heretofore we have pointed out that in order for the Legislature to prevent the Chancellor from exercising a part of the general equity jurisdiction of the Court of Chancery, it must do two things, viz., express the intention to confer that particular part of equity jurisdiction upon some other tribunal exclusively and, at the same time, create in that tribunal remedies which are the equivalent of the remedies that would have been available in the Court of Chancery.
With this understanding of the power of the Legislature, we turn now to a consideration of the sufficiency of the purportedly exclusive remedy provided in the Family Court Act which appellant argues creates a sufficient remedy for a deserted wife in another tribunal and thus takes away the power of the Chancellor to act. This requires a comparison of the new remedy with the remedy that was available to her in Equity.
A destitute and deserted wife suing for separate maintenance in the Court of Chancery was at all times in complete control of her suit. She was at liberty to select her own counsel. Her expenses of litigation would be defrayed, in the event of her success, by her husband. In the event of the entry of a decree in her favor and the subsequent refusal of her husband to abide by its terms, upon her petition the husband could have been imprisoned for contempt, or until he complied with the terms of the decree. In addition, she could have compelled the sequestration of her husband's property for the satisfaction of the terms of the decree and, finally, in the event the case resulted in a decree adverse to her interests, she had the right to appeal from the decree.
Pursuant to the Family Court Act, a wife in similar circumstances may compel the institution of an action against her husband by making a complaint. The suit, however, is brought in the name of the State of Delaware upon an information, and is at least quasi-criminal in nature. The Family Court may enter an order for the payment of support by the husband in lieu of sentencing the defaulting husband for the misdemeanor of non-support, but in the event the husband refuses to abide by the order for support, the only means of enforcement is the punishment of the husband by the imposition of a sentence for the misdemeanor of which he has been found guilty. The right of appeal lies not in the wife but in the State. The litigation, at least as far as the statute's mandatory provisions require, is entirely within the control of the Attorney General. Whatever the actual practice may be in the Family Court with respect to representation of the wife by private counsel, and control of the action, she has no right under the statute to insist upon her own counsel nor can she force the State to appeal from an adverse decision.
A mere statement of the procedures in the Court of Chancery and in the Family Court suffices to show that the remedy in the Family Court which the Legislature has purported to make exclusive is not in major aspects similar to or the equivalent of that given by the Court of Chancery.
Therefore, while the Legislature has attempted to take away from the Court of Chancery part of its original jurisdiction and to confer that jurisdiction upon another tribunal, it has failed to create in that new tribunal a sufficient remedy as that term is understood in the constitutional definition of the jurisdiction of the Court of Chancery. Consequently, the Chancellor is not prohibited by reason of Section 4367, R.C.1935, from exercising the jurisdiction of the Court of Chancery to award decrees for separate maintenance for the benefit of a deserted and destitute wife.
The decision below is affirmed.
TUNNELL, J., dissents.
TUNNELL, Justice (dissenting).
The division in the court here stems from a divergence of views as to the respective powers of the courts and the Legislature under the Delaware Constitution. We separate at the first stage of the majority's reasoning, before reaching consideration of the subsequent close and troublesome questions resolved by my colleagues. The majority has held that where our Court of Chancery had jurisdiction over a field of litigation in 1792, a *735 statute purporting to take away any portion of that jurisdiction is in part unconstitutional unless the Legislature provides, in lieu of what it takes away, another remedy considered by the courts to be adequate. On the other hand, I am compelled to conclude that whether the substituted remedy is adequate or not is entirely for the judgment of the General Assembly, and this court's views as to its adequacy are unimportant. Since the point of difference concerns the very structure of our judicial system, I feel under a duty to set out my views with more than ordinary particularity.
Looking, as we must, to the constitution for guidance, we find that only three sections furnish information directly bearing on the question before us, Sec. 10[1], Sec. 20, and Sec. 21. Although these sections overlap and must ultimately be viewed as component parts of a single system, we must try to consider them one at a time.
The first sentence of Art. IV, Sec. 20, is as follows: "The General Assembly, notwithstanding anything contained in this Article, shall have power to repeal or alter any act of the General Assembly, giving jurisdiction to the Court of Oyer and Terminer, * * * the Court of General Sessions of the Peace and Jail Delivery, * * * or the Court of Chancery, in any matter, or giving any power to either of the said courts."
This provision was first written into our constitution in 1831. Conceding for the moment the correctness of the majority's statement that after 1792 the General Assembly's power to control Chancery jurisdiction was removed and a certain constitutionally guaranteed minimum of equity relief was afforded, what are we to suppose was the effect of inserting the above quoted language into our constitution in 1831? A brief reference to its historical background will only emphasize the apparent force of this amendment.
The 1831 constitutional convention was primarily aimed at reform of the judiciary. Public dissatisfaction with the courts, having gradually mounted to an agitation extending over a period of more than ten years, had become acute. See Harker's Debates, pp. 43, 57, 84, 90 and 92; and Scharf, History of Delaware, Vol. 1, p. 313. Debate about the courts was sharp, and feelings ran high in the election of delegates to the convention. It was doubtless as a part of a sensible plan to preserve the dignity of the courts by making it unnecessary to subject their shortcomings to public debate in state-wide elections that the 1831 convention adopted the principle set out in Secs. 20 and 21.
Some of the speeches in the 1831 convention are only summarized, and, therefore, it is difficult to follow the genesis of each phrase with the same certainty that is possible in the 1897 convention, where the debates were stenographically reported. Notwithstanding the frequent abbreviations and some omissions, however, it seems clear that the change made was by deliberate and careful design. The Honorable Willard Hall, who was a delegate to the 1831 convention, and who just two years before had revised all our statutes, undoubtedly sounded a note which appealed to the delegates when he said (p. 70 of the Debates): "But in respect to the system proposed in the resolution now under consideration, it is plain and easy, and it leaves room for the Legislature to improve upon it, if found defective. Is not this the correct way? Or will you establish a system which you cannot alter except by a convention?  under which if you suffer, you must suffer long. If the Legislature of this State had been invested with power over our judicial system, they would long since have corrected its evils and found out the system best for us. It is wise to learn by experience."
Since Judge Hall was the federal District Judge for the District of Delaware, undoubtedly it was no coincidence that the final draft of that constitution shared in a *736 general sense two aspects of the federal system: (1) having only one court of constitutionally defined minimum jurisdiction, and (2) leaving the jurisdiction of all other courts (though the creation of only some courts) entirely to the legislature. The 1897 constitution retained those features.
But only the first sentence of what now appears as our Sec. 20 was put into the 1831 constitution. In 1897, by the adoption of the following sentence, for the first time the General Assembly was given the clear right to confer additional jurisdiction upon the courts: "The General Assembly shall also have power to confer upon the Courts of Oyer and Terminer, the Superior Court, the Court of General Sessions, the Orphans' Court and the Court of Chancery jurisdiction and powers in addition to those hereinbefore mentioned."
In explaining this proposed amendment, William C. Spruance, Esq., shortly thereafter appointed to the bench, acting as chairman of the Judiciary Committee for the convention, made the following remark, which appears in the typewritten transcript of proceedings at page 4596: "* * * from the eighth to the twelfth lines, inclusive, it is new, because it was thought that not merely ought the General Assembly to have the power to alter the laws which have conferred upon these courts under their former names jurisdiction, but if the legislature saw fit it ought to have the power of adding to that jurisdiction."
Upon this brief explanation the vote was taken. Thus, the constitutional convention appeared to accept without question a fact which in this cause is denied, that is to say, the right of the General Assembly, without apparent qualification or limitation, to diminish the jurisdiction of a court.
We must pause to point out several things about the specific language of Mr. Spruance above quoted. It obviously cannot be reconciled with the views expressed by the majority of this court. The majority considers that the first sentence of Sec. 20, which had been in the constitution since 1831, referred to the power to repeal only the additional jurisdiction which had been granted since 1792. Now, here in the 1897 convention, the delegates were advised and presumably believed that the General Assembly had not theretofore had such a right to confer additional jurisdiction.
Further, we should note Mr. Spruance's reference to "these courts under their former names". The name of only one court was changed by the 1831 constitution. Since Mr. Spruance used the plural, it shows that he was referring to laws adopted at least prior to the 1831 constitution. The majority had to advance some tenuous verbal distinctions, which we shall later discuss, in order to stop the references to "prior" laws at the 1792 constitution, for before that date even the majority concedes that the General Assembly controlled Chancery jurisdiction. Unfortunately the debates of the 1792 convention were not preserved.
We cannot help pausing here to mention the only remaining sentence in Sec. 20, which is as follows: "Until the General Assembly shall otherwise direct, there shall be an appeal to the Supreme Court in all cases in which there is an appeal, according to any act of the General Assembly, to the Court of Errors and Appeals."
This reference to the power of the General Assembly, though not directly related to our problem, is merely pointed out as one item in what seems to be a comprehensive pattern.
Again returning to the 1831 convention, we observe an illuminating contrast between the Court of Chancery and the Superior Court. The convention had not turned against courts. Apparently there was a desire to retain some check on the General Assembly. Thus, Art. IV, Sec. 7, which in 1831 was designated as Art VI, Sec. 3, conferred upon the Superior Court two types of jurisdiction: (a) general common-law jurisdiction, and (b) such jurisdiction as is "vested by the laws of this State". The precise language then was in substance, and now is: "The Superior Court shall have jurisdiction of all causes of a civil nature, real, personal and mixed, at common law and all other the jurisdiction and powers vested by the laws of this State in the * * * Superior Court". It will be observed that it is only the statutory Superior Court jurisdiction *737 which the Legislature under Sec. 20 has the power to control. This second type of jurisdiction conferred upon the law court, moreover, is the only kind conferred upon the equity court. The same words were employed. The similarity could hardly be a coincidence.
To have a constitutionally guaranteed general jurisdiction in a law court, while denying the counterpart to the equity court, was not a freak provision peculiar to Delaware. Although the majority obviously regards this doctrine as unattractive, Professor Pomeroy describes it as if it were common in American jurisdictions. See 1 Pomeroy's Equity Jurisprudence, (5th Ed.) Sec. 282. Incidentally, Pomeroy also expressly states that Delaware is one of that large group of states in which equity jurisdiction may be abridged, restricted, or modified by statute. Op.Cit., Sec. 282.
Art IV, Sec. 21, is in part as follows: "Section 21. Until the General Assembly shall otherwise provide, the Chancellor shall exercise all the powers which any law of this State vests in the Chancellor, besides the general powers of the Court of Chancery, * * *."
This is another clause which was inserted into our constitution in 1831. The portion of this section on which the majority concentrates was probably added to eliminate any confusion which might otherwise have arisen from the Legislature's indiscriminate and interchangeable use of the terms "Chancellor" and "Court of Chancery". Thus, the very statute which occupies so much attention elsewhere in this opinion, Par. 4367, Revised Code of Delaware 1935, says that the "Court of Chancery" shall have certain powers, but it follows with a proviso that the "Chancellor" shall not exercise those powers where there is an adequate remedy at law. For similar examples see Revised Code of Delaware, 1935, §§ 3091-3097, 4374, 4380 and 4382. The majority's interpretation of this section as wholly irrelevant to our inquiry concentrates attention upon other language but still leaves unexplained the question why the 1831 convention also included in this section, in harmony with Sec. 20, the words "Until the General Assembly shall otherwise provide * * *."
The majority opinion acknowledges that the constitution of 1776 gave the Legislature complete control over the scope of the jurisdiction of the Court of Chancery. In view of that admission, it is interesting to compare Sec. 21 with the language of article 13 of the 1776 constitution, which was the only language in the 1776 constitution on the subject and was as follows:
"Art. 13. The justices of the courts of common pleas and orphans' courts shall have the power of holding inferior courts of chancery, as heretofore, unless the legislature shall otherwise direct."[2]
What, then, is the peculiar quality of Sec. 10 which is so controlling as to override even the legislative power to amend which the framers of the constitution sought to superimpose upon it by Sec. 20? Its wording is as follows: "Section 10. The Chancellor shall hold the Court of Chancery. This court shall have all the jurisdiction and powers vested by the laws of this State in the Court of Chancery."
This language is as it was written for the first time into our 1831 constitution. The majority says that this provision has the effect of guaranteeing to the people of the state that some court will furnish equitable remedies. It would seem, however, that if the second sentence of this section secures any minimum of jurisdiction to anybody, it secures it not to merely some court, but to the Court of Chancery. Still the majority somehow concedes that the legislature has the power to determine what court or courts shall exercise various portions of the general equity jurisdiction, provided only that the substituted court furnishes a remedy as good as that afforded in Chancery. A very real difficulty, then, is to see how, under the majority's view, the will of the Legislature has anything to do with the matter, regardless of what terms and conditions are met. Perhaps that inference can be drawn from the statute which the *738 majority has in some way coupled with Sec. 10 to support its views.
We refer, of course, to the second paragraph of 4367, Sec. 1, of the 1935 Code, which reads as follows: "Provided, that the Chancellor shall not have power to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other Court, or jurisdiction, of this State; but that where matters, determinable at common law, shall be brought before him in equity, he shall remit the parties to the common law; * * *."
There is nothing elsewhere in this statute derogating from the portion quoted. The suggestion seems to be that a statute might oust the Court of Chancery. But what appears to be a simple restraint upon the Court of Chancery has in the majority opinion somehow been transformed into a precise and rather complex restraint upon the General Assembly. Specifically, the majority has interpreted this clause of the statute as preventing the legislature from taking any jurisdiction away from the Court of Chancery except upon the concurrence of two conditions: (1) making the remedy of the new court the equivalent of the one afforded in Chancery, and (2) ousting the Court of Chancery by express language. In just what phraseology this meaning is supposed to lurk is not altogether clear.
Further, if not restrained by the language itself, a recollection of the circumstances of the origin of this statute might have deterred the majority. Repeatedly it has been conceded that this statute was simply the re-enactment of an ancient equity maxim. In the case of Glanding v. Industrial Trust Co., 28 Del.Ch. 499, 45 A. 2d 553, acceptance of this fact was common to both the majority and the dissenting opinions, and both opinions cite earlier Delaware decisions to the same effect. But how is it supposed to be possible that this maxim of equity, developed in Great Britain under a constitutional system bearing little resemblance to ours, happened to contain within it such an elaborate but precise and well formed principle as the majority has found, especially limiting and controlling our General Assembly? Only the English law and equity courts were participants in the classic struggle to which the maxim related; parliament was no more than a bystander.
Returning to the constitution, we note that Sec. 10 says that the Court of Chancery shall have "all the jurisdiction and powers vested by the laws of this State".
First, let us attend to the tortured word "vested". The majority has been at great pains to distinguish this word from all other donative language. This is done from necessity, for without that distinction the majority's long slender chain of reasoning would lack a link. While we can readily see the majority's need for this distinction, its validity is not so easy to see. No authority is cited for it. Certainly the common dictionaries afford no support. Indeed, I fear it is original with our court.
This remarkable word "vested" is supposed to have been used, according to the majority, because of the peculiar history of the Chancery courts in Delaware, which is also said to clarify its meaning. But, though of necessity lacking this Chancery history, precisely the same wording was used to vest the executive powers in the Governor, the legislative powers in the Legislature, and certain of the Superior Court powers in that court. My own suggestion is that the word, a perfectly good one meaning "to give to or confer upon," was simply copied straight out of the federal Constitution.
But this is not the only close distinction upon which the majority is forced to depend. The second one is the supposed vital difference between the "laws of this State", as used in Sec. 10 and Sec. 21 and the "act of the General Assembly," as used in Sec. 20. The Revised Code of Delaware 1935, contains several sections which purport to give jurisdiction to the respective courts of our state. The one referring to the Court of Chancery is Par. 4367, Sec. 1, and in one form or another, has always been upon our statute books since the original counterpart was adopted in 1726-36.[3] *739 These are the statutes beginning with such words as "The Court of Chancery shall have power to hold and decree all causes in equity * * *."[4] The original act of 1726-36 was by the "General Assembly". Each of these subsequent re-enactments was by the General Assembly. Each expressly purported to confer and define the jurisdiction of the Court of Chancery. Undoubtedly they are "laws of this State". Under these facts, it is most natural to suppose that these laws are what are indicated by Sec. 10.
Furthermore, this conclusion is not without the support of respectable authorities. In Equitable Guaranty & Trust Company v. Donahoe, 8 Del.Ch. 422, 430, 45 A. 583, Chancellor Nicholson held that the current re-enactment of the old statute to which we have referred gives the jurisdiction to the Court of Chancery in this state. In Re Reeves, reported in 10 Del.Ch. 483, 486, 94 A. 511, 512, the Supreme Court of this state, referring to Sec. 10 of the constitution and to the statute here under discussion stated: "Except in so far as affected by subsequent statutory provisions, the Court of Chancery is by the above statute vested with jurisdiction and powers according to the course of chancery practice in England." Judge Woolley, in Vol. 1, Sec. 57, of his Delaware Practice refers to "the statute which gives to the Court of Chancery its general jurisdiction," citing the statute as Revised Code, 1852, Chap. 95, Sec. 1. Also see the clear statement in Pomeroy's Equity Jurisprudence, (5th Ed.), Sec. 285.
Another persuasive authority for the view expressed in this opinion, however, is the bare fact that originally, in 1726-36, and continuously ever since, the General Assemblies of this state have painstakingly kept upon our statute books the only law we have purporting to convey and define general equity jurisdiction. This is no obscure or little noticed field of law. Nor is the period from 1736 to date, or even from 1792 to date, unimpressive. Undoubtedly, in connection with the re-enactment or modification of some of these laws at some time since 1792, there have been some good lawyers serving either as members or advisers of one branch or the other of our Legislature, advising the Governors, or subsequently codifying the laws. So far as has come to the court's attention, however, prior to the filing of this majority opinion, nobody previously regarded these post-1792 statutes as surplusage.
The whole thesis of the majority is that the minimum limits of equity jurisdiction were frozen in 1792 and have remained so ever since. Art. 6, Sec. 14 of the 1792 constitution stated: "Sec. 14. The equity jurisdiction heretofore exercised by the judges of the court of common pleas shall be separated from the common-law jurisdiction, and vested in a chancellor, * *."
What the constitutional convention of 1792 did was to take such equity jurisdiction as had been exercised and transfer it to a new and separate court. The majority says that because it was transferred, it was changed in character. By transferring the mutable, it became immutable. Non sequitur.
Finally, the constitution strangely failed to say that equity jurisdiction shall be at least the equivalent of what was vested by the laws of this state in 1792. It could very easily have been so phrased as to state that the "courts of equity (or other courts to which any of its remedies are transferred) shall have at least as broad a field of jurisdiction as was conferred upon them by the constitution and laws of 1792", or "the equity jurisdiction entertained by the several courts of our state shall be as comprehensive as heretofore", or something of the sort. Instead, equity jurisdiction was merely left to be defined by the laws. It hardly seems reasonable to assume that the framers of our constitution, if they had actually had the intention ascribed to them by the majority, would have been so inept or so inconsiderate as to omit such essential *740 qualifying language. It seems simpler to suppose that Sec. 10 contemplates and is compatible with Sec. 20.
Now about the Glanding Case, supra. The majority concedes that it is distinguishable, for it did not relate to any question of the power of the General Assembly expressly to exclude a court from a field of jurisdiction. No dicta can be cited from it relating to our point. To that extent I can agree with the majority. But they are reluctant to let it go. Lacking support from its ratio decidendi or dicta, they still say that the "underlying implications" of that case are arrayed on their side. I am compelled to disagree with what the Court of Chancery has said in this case and in Delaware Trust Co. v. McCune, 80 A.2d 507, about the holding of the Glanding Case. And if the "underlying implications" of the Glanding Case are what the majority here says they are, I am, of course, forced to disagree with it as well. But with such portions of the Glanding Case as the lines of the opinions themselves appear to express I see no reason here to agree or disagree.
As a coup de grace to this dissent, the majority has invoked some doctrines of constitutional interpretation which sound more impressive upon simple enumeration than they appear to be upon individual analysis in relation to this case: the "underlying theory" of written constitutions, the separation of powers, the independence of the judiciary, and the menace described as "the vagaries of legislative whim".
The underlying theory of written constitutions is said to secure to the people "certain unchangeable rights and remedies". Just why they are unchangeable, whether the people want them so or not, is unexplained. The majority has quite frankly taken refuge in the philosophy of government. In doing so, our court must be one of the last to adhere to that discredited principle which once had some scattered support. In modern times courts are not considered to be free to steep themselves in the supposed "spirit" of a constitution and on that vague ground to override a clear expression of the legislative will. 11 Am.Jur., Constitutional Law, § 135. If a statute is to be declared unconstitutional, it must be on the basis of what the constitution says, not what the court thinks is hinted at, nor even what the court thinks it should have said.
As for the doctrine of separation of powers, several answers would be possible. This may not be an attempt by the legislature to exercise judicial functions in the sense which would violate the doctrine of separation of powers. Moreover, the doctrine of "checks and balances" is an equally respected constitutional principle which, pro tanto, limits and qualifies the separation of powers. And our state, unlike some, has no clause in its constitution incorporating the doctrine of "separation of powers". But the only thought it is necessary to discuss, it seems to me, is that the doctrine of separation of powers has no validity except in the event and to the extent that it is conferred by the constitution.
The State of Pennsylvania originally omitted to provide for any court of general equity jurisdiction. The Legislature thereupon proceeded to adjudicate certain equity causes. Quite understandably, such an action by the Legislature was assailed, ultimately in the Supreme Court of the United States, as doing violence to the doctrine of separation of powers. Livingston v. Moore, 7 Pet. 469, 546, 10 Curtis, 546, 552, 8 L.Ed. 751. In dismissing this contention, Mr. Justice Johnson, speaking for the court, said: "The power existing in every body politic is an absolute despotism; in constituting a government, the body politic distributes that power as it pleases, and in the quantity it pleases, and imposes what checks it pleases upon its public functionaries. The natural distribution and the necessary distribution to individual security, is into legislative, executive, and judicial; but it is obvious that every community may make a perfect or imperfect separation and distribution of these powers at its will. It has pleased Pennsylvania, in her constitution, to make what most jurists would pronounce an imperfect separation of those powers; * *."
I do not cite this authority to suggest that in the present instance there is any violation *741 of the principle of the separation of powers. Consideration of that question, as I have said, is outside the proper province of this court. But if it is imperfect, we must, nevertheless, respect it as it is and uphold it rigidly until the sovereign power, not a court, sees fit to make it over.
The majority has said that under my view the Legislature could abolish all the courts, and the Delaware judiciary would be subjected to the "vagaries of legislative whim". In this opinion it has already been pointed out that the Superior Court was by express constitutional language given common law jurisdiction, and that, of course, is not subject to curtailment at the hands of the General Assembly. As for the supposed impracticability of my conclusion, I seek to draw upon the experience of the United States Government, which, in turn, was so freely drawn upon by the delegates to the Delaware constitutional convention of 1831. We have only one federal court of constitutionally defined jurisdiction. Yet the federal District Courts and the Circuit Courts of Appeals, as well as numerous other federal courts, have been able to continue in existence up to the present without any more protection than that enjoyed by the Delaware Court of Chancery. If it should transpire, however, that the legislative branch of our state government should become as irresponsible and anti-social as the majority feels bound to anticipate, my only answer is that it is our duty to read the constitution as it is, not to improve it.
The point on which this dissent is based was not contested before the Chancellor, so I can say without reflection upon any individual that the reluctance of courts to surrender any part of their jurisdiction is notorious. Where merely another court is concerned, perhaps this attitude is in a rough way fair. But in a contest with the executive or legislative branches of the government, the courts are under the strictest of duties not to take advantage of their position as interpreters of the laws and the constitution. Above all else, we on the courts must respect the sovereign power of the people wherever it has attempted to restrain the judiciary.
Since I believe that in the matter before us we are governed by the expressed will of the General Assembly, I do not consider that the Court of Chancery has jurisdiction of this cause.
NOTES
[1] The stated facts are contained in the complaint filed below and must be taken as true since the appeal is from the denial of a motion to dismiss the complaint which necessarily admits the truth of the allegations.
[2] Prior to the constitutional amendment of May, 1951, these were designated as Sections 20 and 21 of Article IV. They will be referred to herein under their new designations.
[3] An exhaustive review of the historical background of Delaware equity courts will be found in both the majority and minority opinions of the Glanding case.
[4] E. g., Sections 3091-3097, R.C.1935 (duties with respect to lunatics); Section 3660, R.C.1935 (power to take acknowledgments); Section 1866, R.C.1935 (Board of Canvass); Section 2600, R.C. 1935 (Approval of admissions of orphans to Murphy School); Section 4407, R.C. 1935 (Appointment of statutory receivers for insolvent corporations); Sections 4387-4404, R.C.1935 (Appointment of trustees and supervision over trusts); Section 4256, R.C.1935 (Reporting of equity decisions).
[5] E. g., 5 Laws of Del., Ch. LXXXV, giving the Chancellor jurisdiction over the partition of land.
[6] Oxenden v. Oxenden, 1705, 2 Vern. 493, 23 Eng.Rep. 916; Danvers v. Danvers, 1711, 2 Vern. 671, 23 Eng.Rep. 1037; Williams v. Callow, 1717, 2 Vern. 751, 23 Eng.Rep. 1090; Gardener v. Walker, 1722, 1 Strange 503, 93 Eng.Rep. 662; Watkyns v. Watkyns, 1740, 2 Atk. 96, 23 Eng.Rep. 460; Head v. Head, 1745, 3 Atk. 295, 26 Eng.Rep. 972; Ball v. Montgomery, 1793, 2 Ves.Jr. 191, 30 Eng.Rep. 588.
[7] Ashton v. Ashton, 1650, 1 Ch.Rep. 162, 21 Eng.Rep. 538; Russell v. Bodvil, 1660-61, 1 Ch.Rep. 186, 21 Eng.Rep. 515; Whorwood v. Whorwood, 1662-63, 1 Ch.Rep. 223, 21 Eng.Rep. 556; Whorewood v. Whorewood, 1675, 1 Ch. Cas. 250, 22 Eng.Rep. 785.
[8] 1 Fonblanque's Equity, Ch. II, § 6, p. 104, note (n); 1 Bishop on Marriage, Divorce and Separation, § 1394; 3 Story's Equity Jurisprudence, § 1859, note 2.
[9] The Ecclesiastical Courts were abolished on July 5, 1641 by 16 Charles I, c. 11, s. 4, and re-established after the Restoration by Statute I, 13 Charles II, c. 2.
[10] Legard v. Johnson, 1797, 3 Ves.Jr. 352, 30 Eng.Rep. 1052; Duncan v. Duncan, 1815, 19 Ves.Jr. 394, 34 Eng.Rep. 564; Stones v. Cook, 1835, 8 Sim. 321, 59 Eng.Rep. 127.
[11] Hyat's Case, 1615, Cro.Jac. 364, 79 Eng.Rep. 312; Anonymous, 1681, 2 Show.K.B. 283, 89 Eng.Rep. 941.
[12] See also Ayliffe's Parergon 58 (1734); Poynter on Marriage and Divorce 246; Shelford on Marriage and Divorce 586.
[13] Shelford on Marriage and Divorce 574; Poynter on Marriage and Divorce 240, and see 10 Halsbury's Laws of England, 2nd Ed., §§ 931, 946, 951 and 1263.
[14] Shelford on Marriage and Divorce 586; Poynter on Marriage and Divorce 246; Ayliffe's Parergon 58.
[15] Poynter on Marriage and Divorce 240; Shelford on Marriage and Divorce 574.
[16] De Blois v. De Blois, 3 W.W.Harr. 430, 138 A. 640; Schofer v. Schofer, 191 Md. 549, 62 A.2d 565.
[17] 3 Blackstone's Commentaries 101.
[18] Shelford on Marriage and Divorce, 485 et seq.
[19] See cases collected in an annotation in 141 A.L.R. 399.
[20] This maxim is the fundamental source of all general equity jurisdiction. Whenever there exists a legal, as opposed to a purely moral right, which is either not recognized by the law courts, or for which the remedy administered by the law courts is inadequate, incomplete or uncertain, the maxim will be applied by a Court of Equity in support of its jurisdiction to give relief. 2 Pomeroy's Equity Jurisprudence, Sec. X, § 424 (5th Ed.)
[1] Unless otherwise noted, all subsequent references in this opinion are to Article IV of the 1897 Constitution as it stood prior to the adoption of the 1951 Judiciary amendment. This suit was brought prior to that amendment, and in any case, there was no material change made in 1951 in any of the matters with which this opinion is concerned.
[2] In quite another connection it is interesting to note that this language has been held by the majority to be insufficient to "vest" jurisdiction in the courts therein named.
[3] For a comprehensive discussion of this statute see Glanding v. Industrial Trust Co., 28 Del.Ch. 499, 45 A.2d 553.
[4] Omitting reference to the various session laws, different forms of this same statute appear in the codifications of our laws as follows: Vol. 1, Laws of Delaware; Chap. LIV a, Hall's Digest of 1829, under the title "Courts", Chap. I, Sections 21 and 25, respectively; 1852 Code, Chap. 95, Sec. 1, Paragraphs 1932 and 1933; Revised Code of 1893, Par. 704; 1915 Code, Par. 3844.