**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

LG ELECTRONICS, INC.,                                     )
                                                          )
           Plaintiff,                                     )
                                                          )
              v.                                          )          C.A. No. 9747-VCL
                                                          )
INTERDIGITAL COMMUNICATIONS, INC.,                        )
INTERDIGITAL TECHNOLOGY CORPORATION,                      )
and IPR LICENSING, INC.,                                  )
                                                          )
           Defendants.                                    )


**OPINION**

Date Submitted:  July 16, 2014
Date Decided:  August 20, 2014

Jeremy D. Anderson, Joseph B. Warden, FISH & RICHARDSON P.C., Wilmington, Delaware; Michael J. McKeon, Christian A. Chu, Scott A. Elengold, FISH & RICHARDSON P.C., Washington, District of Columbia; *Attorneys for Plaintiffs.*

Neal C. Belgam, Kelly A. Green, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; David S. Steuer, Matthew R. Reed, WILSON SONSINI GOODRICH & ROSATI, Palo Alto, California; *Attorneys for Defendants.*

**LASTER, Vice Chancellor.**

LG Electronics, Inc. ("LG") and the defendants are parties to an arbitration before the International Centre for Dispute Resolution. After LG filed the arbitration, the parties entered into a non-disclosure agreement, titled "Agreement Governing Confidential Settlement Communications" (the "NDA"). LG alleges in this action that the defendants, whom this decision refers to collectively as "InterDigital," breached the NDA by submitting certain documents to the arbitrators. As a remedy, LG seeks a permanent injunction compelling InterDigital to withdraw the offending documents and to refrain from further breaches of the NDA. InterDigital has moved to dismiss on the grounds that LG's claims are properly before the arbitral tribunal and this court should defer to the tribunal under *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Co.*, 263 A.2d 281 (Del. 1970). The motion to dismiss is granted.

## I.    FACTUAL BACKGROUND

The facts are drawn from LG's verified complaint and the documents it incorporates by reference. At this procedural stage, the complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences.

### A.    The 2006 Patent License Agreement

In 2006, LG and InterDigital entered into a Wireless Patent License Agreement (the "License Agreement" or "PLA"). Section 5.2 provides that if the parties cannot resolve a dispute through negotiation, then either party can submit the dispute to arbitration. PLA § 5.2. The parties disagree about whether the License Agreement remains in force.

1

## B.    The ITC Proceedings

On July 26, 2011, InterDigital filed a complaint with the United States International Trade Commission (the "ITC") against a range of defendants. In substance, InterDigital alleged that the defendants had imported wireless devices that infringed InterDigital's patents. In December, InterDigital added LG and two of its subsidiaries as defendants. On January 20, 2012, LG moved to terminate the ITC proceeding on the grounds that the License Agreement covered its products and the terms of the License Agreement entitled it to arbitrate InterDigital's claims. An administrative law judge issued an initial determination that LG's request for arbitration was not "wholly groundless" and terminated the proceeding as to LG. After multiple rounds of appellate review, the United States Supreme Court ordered the ITC to dismiss the case.

## C.    The Arbitration Proceedings

On March 19, 2012, while still a party to the ITC proceeding, LG filed a demand for arbitration with the International Centre for Dispute Resolution. The demand sought a determination that the License Agreement gives LG the right to use the patents that InterDigital asserted in the ITC proceeding. Shortly after LG initiated the arbitration, InterDigital and LG entered into the NDA. The NDA defines certain types of documents and communications as "Settlement Communications" and restricts the abilities of the parties to use those Settlement Communications. Significantly, the NDA does not contain an arbitration provision.

An arbitral tribunal (the "Tribunal") was constituted on January 17, 2013. On April 19, LG submitted its opening brief to the Tribunal. LG made a point of stating that

2

it had not included any information in its brief about the negotiation of the License Agreement or certain post-signing communications with InterDigital because LG believed that those matters fell within the NDA's definition of Settlement Communications and could not be used in the arbitration.

In response, InterDigital asked the Tribunal to rule on whether the NDA applied to pre-NDA communications. InterDigital argued the parties only intended for the NDA to cover prospective settlement communications and not to prevent the submission of pre-NDA evidence to the Tribunal. LG responded by advancing its own interpretation of the NDA, which stressed that the NDA extended to anything that fell within the definition of Settlement Communications "at any time." Pl.'s Compl. Ex. C at 3-5.

On May 8, 2013, the Tribunal ruled that InterDigital's request was "premature." Pl.'s Compl. Ex. D. The Tribunal took "the view that the [NDA] issue is one of the admissibility of evidence rather than of the [meaning] of the NDA" and stated that it would address that question if it became necessary to do so. *Id.* at 2.

InterDigital submitted its response brief to the Tribunal on May 31, 2013. LG contends that InterDigital's brief improperly disclosed Settlement Communications to the Tribunal. Shortly thereafter, the parties agreed to a temporary stay of the arbitration.

**D.     This Litigation**

On June 2, 2014, InterDigital asked the Tribunal to lift the stay. Two days later, LG submitted a concurring letter. With the stay lifted, LG asked InterDigital to withdraw its brief and re-file it without the alleged Settlement Communications. InterDigital

3

refused. On June 9, LG filed this suit, seeking injunctive relief compelling InterDigital to withdraw its brief and barring it from breaching the NDA in the future.

## II. LEGAL ANALYSIS

InterDigital has moved to dismiss LG's complaint in favor of the arbitration. InterDigital does not assert that the court lacks subject matter jurisdiction over the dispute. Rather, it asks the court to exercise its discretion under the *McWane* doctrine to dismiss this action in favor of the earlier-filed arbitral proceeding.

The Delaware Supreme Court held in *McWane* that "a Delaware action will *not* be stayed as a matter of right by reason of a prior action pending in another jurisdiction involving the same parties and the same issues," but that "such [a] stay *may* be warranted . . . by facts and circumstances sufficient to move the discretion of the Court." 263 A.2d at 283 (emphasis added). Nevertheless, "such discretion should be exercised freely in favor of the stay when there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues." *Id.* In lieu of granting a stay, a Delaware court applying *McWane* may dismiss the later-filed Delaware action in favor of the first-filed proceeding. *See* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 5.01 at 5-3 (2013).

### A. The Arbitration Constitutes A First-Filed Action.

The first question when applying the *McWane* doctrine is whether "there is a prior action pending elsewhere." *McWane*, 263 A.2d at 283. Although the arbitration was filed before this action, LG asserts that an arbitral proceeding cannot constitute a "prior

4

action" under *McWane*. There do not appear to be any cases in which a Delaware court has applied *McWane* to dismiss a suit in favor of a first-filed arbitration. LG claims that the lack of precedent means *McWane* does not apply to a first-filed arbitration.

There is a logical reason for the dearth of cases other than the inapplicability of *McWane* to a prior pending arbitration. In most cases involving an existing arbitration, the defendant will move to dismiss the later-filed action on the grounds that the parties are required to arbitrate the dispute. The court will then rule on the issue of substantive arbitrability or, depending on the parties' contract, dismiss the action so that the arbitral tribunal can rule on that issue. If the dispute is arbitrable, *McWane* never comes up. If the dispute is not arbitrable, then the arbitral tribunal is not "capable of doing prompt and complete justice" and *McWane* does not apply.

Due to an uncommon confluence of factors, InterDigital's *McWane* argument avoids this Morton's fork. The parties agree that the Tribunal at least has the power to determine if the underlying dispute is arbitrable, and the parties also agree that the specific matter at issue in this case arises out of the NDA, which does not contain an arbitration provision. This case therefore presents the rare instance when both the arbitral tribunal and the court have jurisdiction such that *McWane* could apply.

In *McWane*, the Delaware Supreme Court discussed two primary policy rationales for the *McWane* doctrine. First, it "avoid[s] the wasteful duplication of time, effort, and expense that occurs when judges, lawyers, parties, and witnesses are simultaneously engaged in the adjudication of the same cause of action in two courts." *Id.* Second, it "avoid[s] . . . the possibility of inconsistent and conflicting rulings and judgments and an

5

unseemly race by each party to trial and judgment in the forum of its choice." *Id.* Both rationales apply with equal force to a first-filed arbitration.

In other contexts, such as for purposes of issue and claim preclusion, this court has treated an arbitration as a prior action. *See, e.g.*, *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 89-90 (Del. Ch. 2013) (applying collateral estoppel doctrine to an arbitration panel's holding); *Brown v. T-Ink, LLC*, 2007 WL 4302594, at *14 n.63 (Del. Ch. Dec. 4, 2007) (noting that if the challenged arbitration proceeded to a final decision, it "[might] have issue or claim preclusive effect"). Similarly for purposes of *McWane*, there does not appear to be a principled distinction between a first-filed action in a court in another jurisdiction and a first-filed arbitration. The arbitration constitutes a first-filed action for purposes of the *McWane* doctrine.

## B. The Tribunal Can Provide Prompt And Complete Justice.

The next step in the *McWane* analysis is to determine whether the Tribunal can provide prompt and complete justice. LG contends that the Tribunal cannot provide prompt and complete justice because the NDA does not contemplate arbitration and because the Tribunal cannot award equitable relief.

### 1. The Dispute Is Arbitrable.

"[A]rbitration is a matter of contract . . . ." *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 78. "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* As LG points out, the NDA does not contain an arbitration provision. Instead, it provides that "any Party shall have the right . . . to have the provisions of this Agreement specifically enforced by any court, agency, or

6

tribunal having personal jurisdiction over the Party." Pl.'s Compl. Ex. A § 9. LG argues that this provision entitles it to seek relief in a judicial forum, rather than an arbitral one.

In one sense, LG's reading is overly narrow. The reference to an "agency" suggests that the parties did not intend to limit themselves strictly to judicial fora, and the word "tribunal" is broad enough to include arbitral tribunals. But LG is correct that the language is not sufficiently clear to constitute an agreement to arbitrate the dispute. *See DMS Properties-First, Inc. v. P.W. Scott Assocs., Inc.*, 748 A.2d 389, 391 (Del. 2000) ("A party cannot be forced to arbitrate the merits of a dispute . . . in the absence of a clear expression of such intent in a valid agreement."). The NDA is therefore not dispositive. It neither empowers InterDigital to force LG to arbitrate this dispute nor entitles LG to insist on a judicial forum.

InterDigital argues that the dispute under the NDA is nonetheless arbitrable because it is an evidentiary matter incidental to the arbitration. Delaware courts are generally reluctant to get involved in procedural disputes in arbitrations, and for good reason. "To have a Delaware court inject itself into [such] situation[s] would show disrespect toward the Arbitration panel, which has the broad authority to address these issues in the first instance, and would be contrary to our state's—and our nation's—strong public policy favoring arbitration." *SOC-SMG, Inc. v. Day & Zimmermann, Inc.*, 2010 WL 3634204, at *3 (Del. Ch. Sept. 15, 2010) (footnotes omitted).

The *SOC-SMG* case is instructive. There, SOC-SMG brought suit in Delaware seeking to disqualify the defendants' counsel in a JAMS arbitration. Chief Justice Strine, then a Vice Chancellor, granted summary judgment *sua sponte* against SOC-SMG, ruling

7

that "[j]ust as a trial judge should deal in the first instance with alleged discovery abuses or attorney misconduct in cases before her, so should an arbitration panel." *Id.* As he noted, arbitrators routinely resolve "the discovery issues necessarily related to" the disputes before them, and "courts have refused to intervene on an interlocutory basis to either first-or second-guess those rulings." *Id.* at *2. "Rather, the interests of justice are served by charging the arbitrators with deciding the overall matter, including allegations of discovery abuse and disqualification motions, in the first instance." *Id.* The same rationale applies to evidentiary disputes like the one at issue in this action.

The fact that this dispute arises out of a separate contract does not change the outcome. "Once it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964); *see also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) ("[Procedural questions] are presumptively *not* for the judge, but for an arbitrator, to decide."). The "subject matter" of the dispute is not whether InterDigital's brief breaches the NDA; it is whether the License Agreement grants LG a license to use the patents that were at issue in the ITC proceedings. LG does not argue that that dispute is not arbitrable. Indeed, it was LG that initiated the arbitration.

In a similar case, the United States Court of Appeals for the Seventh Circuit held that a district court judge had erred by ruling that the arbitrators did not have the power to construe a confidentiality agreement, even though the confidentiality agreement itself did not contain an arbitration clause. *See Trustmark Ins. Co. v. John Hancock Life Ins. Co.*

8

*(U.S.A.)*, 631 F.3d 869, 874 (7th Cir. 2011) (Easterbrook, J.). As the *Trustmark* panel noted, "[a]rbitrators who have been appointed to resolve a commercial dispute are entitled to resolve ancillary questions that affect their task." *Id.* "Arbitrators are entitled to decide for themselves those procedural questions that arise on the way to a final disposition . . . ." *Id.* Allowing parties to seek judicial review of procedural decisions "would be the end of arbitration as a speedy and (relatively) low-cost alternative to litigation." *Id.* Other federal courts of appeal similarly have held that trial courts should decline to address procedural or preliminary disputes that arise during the course of an arbitration. *See, e.g.*, *Savers Prop. & Cas. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 748 F.3d 708, 722 (6th Cir. 2014) (holding that it was improper for a district court to review an arbitral panel's procedural rulings absent a final award); *Michaels v. Mariforum Shipping, S.A.*, 624 F.2d 411, 414-15 (2d Cir. 1980) (noting that policy considerations counsel against allowing parties to obtain review of arbitrators' preliminary rulings).

The logic of these cases is persuasive. Allowing parties to seek judicial review every time an arbitrator rules on—or, as in this case, declines to rule on—a procedural issue would frustrate the arbitral process. If the Tribunal errs, LG can seek judicial review after the award becomes final. *See SOC-SMG*, 2010 WL 3634204, at *3. Until then, this court will not interfere with the Tribunal by providing an *ad hoc* forum for interlocutory review.

9

**2. The Tribunal Can Provide Equitable Relief.**

LG also argues that the Tribunal cannot provide prompt and complete justice because the License Agreement provides that the Tribunal shall act "as arbitrators at law only." PLA § 5.2(c). According to LG, this language renders the Tribunal incapable of awarding LG the injunctions it seeks because they constitute equitable relief. Delaware is one of the few remaining jurisdictions where this argument has resonance, because Delaware has retained its separate court of equity. Capitalizing on this court's familiarity with the distinction between law and equity, LG argues that an "arbitrator at law" only can grant the types of relief that could be granted by a common law court. LG's wishful reading does not bear close scrutiny. Rather than hearkening back to the traditional division between law and equity, the "arbitrator at law" concept addresses a quite different distinction in the world of arbitration between arbitrators who decide cases by following the legal principles of a particular jurisdiction—largely as a court of law in that jurisdiction would—and arbitrators who have far greater freedom to select the applicable law, depart from that law, and impose case-specific remedies based on a sense of fairness. By specifying that the Tribunal will act as "arbitrators at law," the parties to the License Agreement opted for the former, not the latter, but they did not constrain the Tribunal's authority to grant injunctive relief.

The distinction between the courts of law and equity dates back to medieval England, where the English Court of Chancery evolved to "provide[] judicial relief to those left remediless because of the procedural rigidity, corruption, and inadequate enforcement machinery of the common law." William T. Quillen & Michael Hanrahan,

10

*A Short History of the Delaware Court of Chancery—1792-1992*, in *Court of Chancery of the State of Delaware—1792-1992*, at 22 (1993). When litigants could not obtain relief in the common law courts, they petitioned the king, appealing to the sovereign's oath to provide "equal and right justice" to his subjects. *See* J.H. Baker, *An Introduction to English Legal History* 98 (4th ed. 2002). As sovereign, the king lawfully could deploy force to coerce a defendant into providing a fair remedy that fit the circumstances of the case, leading to the equitable maxim that "equity acts on the person." Wolfe & Pittenger, *supra*, at v (listing "THE MAXIMS OF EQUITY" and including "Equity acts in personam, and not in rem.").

"Appeals to the king, instead of to his courts, became numerous, and about the time of Edward I, it became usual to refer such petitions for consideration and disposition to the Lord Chancellor," who was one of the king's principal domestic advisors. Thomas O. Main, *Traditional Equity and Contemporary Procedure*, 78 Wash. L. Rev. 429, 441(2003). "In the fourteenth and fifteenth centuries, the [English] Court of Chancery developed into a distinct court." *Id.* at 442. The court had "broad and imprecise" jurisdiction based principally on whether the Chancellor viewed the remedy in the common law courts as being inadequate. *See* Quillen & Hanrahan, *supra*, at 22.

Over time, the role of Chancery and the nature of equity evolved.[1] "The early chancellors decided cases with little or no regard for precedent, basing their decisions

---

[1] *See generally* Dennis R. Klinck, *Conscience, Equity and the Court of Chancery in Early Modern England* (2010) (tracing evolution of concepts of conscience and equity from origins of English Court of Chancery through the end of the eighteenth century); 1 Spencer W. Symons,

11

largely upon their idiosyncratic ideas of 'conscience.'" Main, *supra*, at 445. Variations among individual notions of right or wrong led to Selden's well-known aphorism:

> Equity is a roguish thing. For Law we have to measure . . . ; Equity is according to the conscience of him that is Chancellor, and as that is larger or narrower, so is equity. 'Tis all one as if they should make the standard for the measure we call a "foot" a Chancellor's foot; what an uncertain measure this would be! One Chancellor has a long foot, another a short foot, a third an indifferent foot. 'Tis the same thing in the Chancellor's conscience.

John Selden, "Equity," *Table Talk* (1689), *quoted in* Wolfe & Pittenger, *supra*, at v. But during the same era that Selden wrote these words, a fundamental transformation in the English Court of Chancery was already underway. After becoming Lord Chancellor in 1618, Francis Bacon began the reformation process by issuing one hundred rules of equity. *See* Main, *supra*, at 447; *see also* Story, *supra*, § 51. The path of reform continued after Lord Bacon, particularly under the chancellorships of Lord Nottingham (1673-1682) and Lord Hardwicke (1736-1756), and the exercise of equitable authority became more circumscribed and settled. *See* Main, *supra*, at 447-48; *see also* Klinck, *supra*, at 225-27 (describing efforts of Lord Nottingham and noting that he is "commonly regarded as the father of modern or systematic equity"); Story, *supra*, § 52 (citing efforts of Lord Nottingham and Lord Hardwicke). As early as 1672, the English Court of Chancery was adhering to the doctrine of *stare decisis*, and by 1802, an English decision remarked that courts of equity had "no more discretionary power than courts of law.

---

*Pomeroy's Equity Jurisprudence* §§ 48-62 (5th ed. 1995) [hereinafter *Pomeroy's*] (describing evolving nature of equity); 1 Joseph Story, *Commentaries on Equity Jurisprudence* §§ 38-58 (13th ed. 1886) (same).

They decide new cases, as they arise, by the principles on which former cases have been decided, and may then illustrate or enlarge the operation of those principles; but the principles are as fixed and certain as the principles on which the courts of common law proceed."[2]

Sir William Blackstone's *Commentaries* may have provided the bridge. His monumental work restated English law as a set of substantive rules separate from procedure, and his *Commentaries* drew no distinction between the traditional systems of law and equity:

> Equity then, in its true and genuine meaning, is the soul and spirit of all law: positive law is construed, and rational law is made, by it. In this, equity is synonymous to justice; in that, to the true sense and sound interpretation of the rule. But the very terms of a court of equity, and a court of law, as contrasted to each other, are apt to confound and mislead us: as if the one judged without equity, and the other was not bound by any law. Whereas every definition or illustration to be met with, which now draws a line between the two jurisdictions, by setting law and equity in opposition to each other, will be found either totally erroneous, or erroneous to a certain degree.

3 William Blackstone, *Commentaries on the Laws of England* \*429, at 269 (Coley ed. vol. 1 1872) (1765), *quoted in* Main, *supra*, at 459-60. As Blackstone saw it, courts of law and equity applied the same substantive rules, but they used different procedures to administer the rules and issued different remedies to implement their decisions: "Such then being the parity of law and reason which governs both species of courts, wherein (it

---

[2] *Bond v. Hopkins*, 1 Sch. & Lef. 413, 428 (1802), *quoted in* Main, *supra*, at 448 n.118. *See generally Pomeroy's*, *supra*, § 59 (describing settled nature of equity as "a system of positive jurisprudence . . . founded upon and contained in the mass of cases already decided"); Story, *supra*, §§ 1-37 (describing nature of equity jurisprudence and rejecting claims about unbridled discretion and arbitrariness).

may be asked) does their essential difference consist?  It principally consists in the different modes of administering justice in each; in the mode of proof, the mode of trial, and the mode of relief."  3 Blackstone, *supra*, *436, at 272, *quoted in* Main, *supra*, at 460.

Meanwhile, English settlers in the American colonies brought the motherland's law and procedure with them.  Howard L. Oleck, *Historical Nature of Equity Jurisprudence*, 20 Fordham L. Rev. 23, 40 (1951).  After the American War of Independence, the constitutions of several states, including Delaware, provided for separate courts of equity modeled after the English Court of Chancery. *Id.* at 41.  Under Delaware's constitution, the Delaware Court of Chancery received and possesses "all the general equity jurisdiction of the High Court of Chancery of Great Britain as it existed prior to the separation of the colonies." *DuPont v. DuPont*, 85 A.2d 724, 727 (Del. 1951).  Likewise, Article III, Section 2 of the United States Constitution, empowers the federal courts to hear cases "in Law and Equity."  U.S. Const. art. III, § 2, cl. 1.  Congress did not vest federal equity jurisdiction in a separate court but rather contemplated that federal judges would administer law and equity on different "sides" using different procedures, alternatively acting as common law judge or chancellor depending on whether the case was filed as a common law complaint or a bill in equity.  Main, *supra*, at 450.  When exercising equity jurisdiction, federal courts held "the same [jurisdiction] that the high court of chancery in England possesse[d]." *Miss. Mills v. Cohn*, 150 U.S. 202, 205 (1893).

14

During the mid-19th century, most American states merged their separate courts of law and equity. *See* Main, *supra*, at 464-67; Oleck, *supra*, at 42. The Judicature Acts of 1873 and 1875 achieved the same result in Great Britain. *See* Baker, *supra*, at 114; Main, *supra*, at 476. "Since 1938 the federal district courts of the United States have recognized one merged form of action under the Federal Rules of Civil Procedure." Main, *supra*, at 431. Most recently, Arkansas merged its separate courts of law and equity in 2001. Ark. Const. amend. 80, § 6; Ark. R. Civ. P. 2. Today, only Delaware, Tennessee, and Mississippi retain separate courts of equity.[3] Elsewhere, "[t]he image of separate systems of law and equity is . . . an increasingly fading memory." Main, *supra*, at 431. In Great Britain and in the vast majority of American jurisdictions, a court of law is simply a court, and it can exercise equitable powers when applying and enforcing the law.

In my view, a reading of the License Agreement as a whole demonstrates that its reference to "arbitrators at law" has nothing to do with the traditional division between law and equity. The License Agreement provides that the "[t]he arbitration proceedings shall be governed by . . . the AAA International Rules." PLA § 5.2(c). The version of those rules in effect at the time the License Agreement was executed distinguished between an arbitrator who applies "the substantive law(s) or rules of law . . . applicable to

---

[3] *See* Miss. Code Ann. § 9-5-81 (2013); Tenn. Code Ann. § 16-11-101 (2014). While they lack separate courts of equity, New Jersey maintains a Chancery division in its Superior Court and South Carolina has Masters-in-Equity who handle equitable issues referred to them by the state's Circuit Court. *See* N.J. Const. art. VI, § 3, ¶ 3 ; S.C. Code Ann. § 14-11-15 (2013).

15

the dispute" and an arbitrator who reaches a decision as an "amiable *compositeur* or *ex aequo et bono*." Defs.' Reply Br. Ex. 16 at art. 28. In arbitration lingo, these are very different concepts. "Arbitrators at law" are those who apply the legal precedent of a particular legal system as a court would. An arbitrator acting as an "amiable *compositeur* or *ex aequo et bono*" is free to resolve the dispute by applying broader principles of fairness, largely without reference to the law of a particular legal system.[4]

---

[4] *See Amiable Compositor Law & Legal Definition*, http://definitions.uslegal.com/a/amiable-compositor/ (last visited Aug. 20, 2014) ("The concept of amiable compositor has its historical origins in French law. An amiable compositor acts as a conciliator rather than a decision-maker in a dispute. An amiable compositor is also not bound to apply strict rules of civil procedure and substantive law."); *see also* William Tetley, *Glossary of Conflict of Laws*, McGill University Faculty of Law, http://www.mcgill.ca/maritimelaw/glossaries/conflictlaws/ (last updated June 16, 2011) ("Clauses . . . allowing the arbitrators to act as '*amiables compositeurs*', permit the arbitrators to decide the dispute according to the legal principles they believe to be just, without being limited to any particular national law. . . . The arbitrators are authorized, as '*amiables compositeurs*', to disregard legal technicalities and strict constructions which they would be required to apply in their decisions if the arbitration agreement contained no '*amiable compositeur*' clause."). The roles of amiable *compositeur* and arbitrator *ex aequo et bono* are "somewhat similar" to each other, and "whether there is a difference between the two concepts is a question not sufficiently answered by the scholarship on the subject." Karyn S. Weinberg, *Equity in International Arbitration: How Fair is "Fair"? A Study of* Lex Mercatoria *and Amiable Composition*, 12 B.U. Int'l L.J. 227, 231 n.26 (1994); *see also* William W. Park, *National Law and Commercial Justice: Safeguarding Procedural Integrity in International Arbitration*, 63 Tul. L. Rev. 647, 648 n.1 ("An arbitrator [acting as an amiable *compositeur*] is sometimes said to be deciding *ex aequo et bono*, although it is not clear how congruent the Latin and French expressions really are."). Some scholars assert that they are "considered to mean the same thing," but "at least some systems draw a clear distinction" between the two. Weinberg*, supra*, at 231 n.26. When a distinction is drawn, it is usually that an amiable *compositeur* "must consult the applicable law" and is "allowed to disregard only certain aspects of the applicable law," whereas an arbitrator acting *ex aequo et bono* is allowed to "disregard the relevant legal rules, including mandatory rules." Christine Lecuyer-Thieffry & Patrick Thieffry, *Negotiating Settlement of Disputes Provisions in International Business Contracts: Recent Developments in Arbitration and Other Process*, 45 Bus. Law. 577, 592 & n.75 (1990).

If equity were still Selden's "roguish thing," then there might be a closer analogy between a court of equity and an amiable *compositeur* or an arbitrator acting *ex aequo et bono* such that the traditional law/equity distinction might lend interpretive weight to the phrase "arbitrators at law." But that characterization of equity had lost its force by the beginning of the nineteenth century, if not before, and both Pomeroy and Story demolished it in their treatises. *See Pomeroy's*, *supra*, §§ 56-67; Story, *supra*, §§ 1-37. Today, consistent with the famous maxim, "[e]quity follows the law." Wolfe & Pittenger, *supra*, at v.

The role of an amiable *compositeur* or an arbitrator acting *ex aequo et bono* does not resemble a modern court of equity. "Whereas decisions in equity are deemed to be . . . part of the law, decisions *ex aequo et bono* are imputed to an extra-legal realm." Leon Trakman, Ex Aequo et Bono*: Demystifying an Ancient Concept*, 8 Chi. J. Int'l L. 621, 627 (2008). "The rationale behind this distinction is that adjudicators may 'fill gaps' in the law based on principles of equity, but not based on notions of fairness that are not reduced to legal principles and rules of law." *Id.* "Whereas equity is part of an applicable legal system, notions of equality associated with *ex aequo et bono* are deemed to reside in a moral, social, or political realm that is external to the law."[5] The arbitral roles appear to envision a degree of discretion and ability to depart from legal precedent

---

[5] *Id.*; *see also* Lecuyer-Thieffry & Thieffry, *supra*, at 592 n.75 (noting that under Swiss law, arbitrators deciding *ex aequo et bono* "may . . . disregard the relevant legal rules, including mandatory rules"); Steven J. Stein, *The Drafting of Effective Choice-of-Law Clauses*, N97AICB ABA-LGLED A-103, 104 (1997) (noting that "arbitrators . . . deciding on a purely *ex aequo et bono* basis" are the exception to the rule that "all arbitral decisions are made under some law").

and doctrine far beyond anything that an American court would regard as permissible, even a true court of equity like the Delaware Court of Chancery or a federal court wielding the full panoply of its equitable authority.

In my view, the reference in the License Agreement to "arbitrators at law" was not designed to limit the powers of the arbitral tribunal to those held by a common law court in a jurisdiction, like Delaware, that maintains the traditional distinction between law and equity. The reference rather was intended to establish that the arbitrators would reach a decision in a manner analogous to a court, namely by consulting the language of the contract, applying its plain meaning, considering evidence of the parties' intent if the contact's language is ambiguous, and relying on case precedents and similar authorities. The language was not intended to prevent the Tribunal from awarding equitable relief, any more than a court of law is precluded from awarding equitable relief in a jurisdiction that has merged its systems and no longer distinguishes between courts of law and courts of equity.

Section 5.2(c) of the License Agreement reinforces this interpretation by providing that "[t]he Arbitration Panel has no power to reform this Agreement." PLA § 5.2(c). "Reformation is an equitable remedy . . . ." 76 C.J.S. *Reformation of Instruments* § 1 (2014); *accord James River-Pennington, Inc. v. CRSS Capital, Inc.*, 1995 WL 106554, at *8 (Del. Ch. Mar. 6, 1995) ("Reformation is an equitable right . . . ."). If the arbitrators at law could not grant equitable relief, then there would be no need to deny them the power to grant reformation. The most natural reading of the "arbitrators at law" language is to make clear that the arbitrators will decide the case by applying legal principles as a

18

court would, instead of acting as "amiable *compositeur[s]* or *ex aequo et bono*." The language does not foreclose equitable relief.

LG also contends that its claim for injunctive relief exceeds the scope of the relief that the Tribunal can grant, because it seeks "an injunction . . . prohibiting InterDigital from further breaching the NDA by disclosing, using, and relying on Settlement Communications and other confidential information to the Tribunal and elsewhere." Compl. at 13. The "and elsewhere" language, LG argues, would extend to situations outside the Tribunal's purview. That claim, however, is not yet ripe. "Injunctions may, of course, be issued where the evidence establishes a pattern of conduct from which a court may and does conclude that there is a reasonable apprehension of risk of future breaches of duty of a predicable type." *Thorpe v. Cerbco, Inc.*, 1996 WL 560173, at *4 (Del. Ch. Sept. 13, 1996) (Allen, C.). But this is not such a case. Even taking all of LG's allegations as true, InterDigital has only breached the NDA once, and it has never breached it outside of the arbitration. LG has made no allegation whatsoever that there is any "pattern of conduct" involving the disclosure of Settlement Communications "elsewhere." The only plausibly ripe claim for a permanent injunction would be one barring future breaches of the NDA in submissions to the Tribunal. If LG wishes to press such a claim, it should do so before the Tribunal, not here. LG's other requested injunctive relief—a mandatory injunction requiring InterDigital to withdraw its arbitration brief—is relief that the Tribunal is capable of granting by simply striking the brief.

19

The License Agreement evidences a clear intent to submit claims for equitable relief to arbitration, and LG's only ripe claim is properly within the Tribunal's jurisdiction. The Tribunal is capable of providing LG with the relief it seeks. Consequently, the Tribunal can provide prompt and complete justice for purposes of the *McWane* doctrine.

## C. The Arbitration Involves The Same Parties And Issues.

LG does not dispute that this action and the arbitration involve the same parties. It does argue, however, that the two proceedings do not involve the same issues.

*McWane* does "not require[] that the parties and issues in both actions be identical. Substantial or functional identity is sufficient." *AT&T Corp. v. Prime Security Distribs., Inc.*, 1996 WL 633300, at *2 (Del. Ch. Oct. 24, 1996). LG contends that this action calls for the interpretation of the NDA and the determination of whether InterDigital breached it, but the only alleged breach is InterDigital's submission of its arbitration brief. That issue has been placed before the Tribunal, so the *McWane* doctrine's requirement of "substantial or functional identity" is met.

## III. CONCLUSION

InterDigital has established that (i) the arbitration constitutes a prior action, (ii) the Tribunal is capable of doing prompt and complete justice, and (iii) the arbitration involves the same parties and the same issues. LG has not identified any other reasons why this court should not exercise its discretion freely in favor of the first-filed arbitration. This action is dismissed under the *McWane* doctrine.

20