**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

IN RE CARLISLE ETCETERA LLC,      )
a Delaware limited liability company.     )      C.A. No. 10280-VCL

**OPINION**

Date Submitted: March 9, 2015
Date Decided: April 30, 2015

Kurt M. Heyman, Aaron M. Nelson, PROCTOR HEYMAN ENERIO LLP, Wilmington, Delaware; *Attorneys for Well Union U.S. Holdings, Inc. and Well Union Capital Limited*.

David J. Margules, Sean J. Bellew, Erika Caesar, BALLARD SPAHR LLP, Wilmington, Delaware; Thomas M. Wood, IV, NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A., Baltimore, MD; *Attorneys for Tom James Company*.

**LASTER, Vice Chancellor.**

In 2012, petitioner Well Union Capital Limited ("WU Parent") and respondent Tom James Company ("James") formed Carlisle Etcetera LLC, a Delaware limited liability company ("Carlisle" or the "Company"). They executed a simple form of operating agreement (the "Initial LLC Agreement") in which they committed to work promptly on a more detailed operating agreement to replace the original one.

After the Company was formed, WU Parent transferred its member interest to a wholly owned subsidiary called Well Union U.S. Holdings, Inc. ("WU Sub"). James knew about the transfer, did not object, and treated WU Sub as a member from that point on. For purposes of the Delaware Limited Liability Company Act (the "LLC Act"), however, the transfer rendered WU Sub an assignee, rather than a member.

WU Parent and James never reached agreement on a replacement operating agreement. Other disputes arose, and the relationship deteriorated. Deadlock prevailed at the manager level, where the Initial LLC Agreement called for a board of directors (the "Board") to serve as the singular manager of the Company. The Board has four members, two appointed by WU Parent and two by James. They split 2-2 on key issues.

Both sides eventually recognized that they could not manage the Company jointly and that one side needed to buy out the other. Despite some initially positive signs, they could not agree on a buyout procedure or a price.

During the venture's halcyon days, the Board appointed a James executive as the Company's CEO. Through the CEO, James controls the Company's day-to-day operations. With the Board deadlocked, the CEO has been operating free of any oversight. Given its advantaged position, James does not see the deadlock as a problem

1

and feels no urgency to alleviate it. During negotiations over the buyout, James sought to use its privileged position to extract concessions from WU Sub.

WU Sub turned to this court for assistance. It filed this action, in which it petitioned to dissolve the Company. James moved to dismiss on the grounds that WU Sub is an assignee, not a member, and that an assignee lacks standing to petition for statutory dissolution under Section 18-802 of the LLC Act. 6 *Del. C.* § 18-802. In an amended petition, WU Parent joined as a co-petitioner.

This decision holds that WU Parent and WU Sub lack standing to petition for statutory dissolution under Section 18-802. The motion is denied, however, because WU Sub has standing to seek dissolution in equity.

## I.      FACTUAL BACKGROUND

The facts for purposes of the motion to dismiss are drawn from the allegations of the verified amended petition for dissolution, which is the currently operative pleading, as well as from the documents that it incorporates by reference. In the current procedural posture, the well-pled allegations of the petition are assumed to be true, and the petitioners receive the benefit of all reasonable inferences.

### A.      The Formation Of The Company

James describes itself as the world's largest manufacturer and retailer of custom clothing that uses a business model in which tailors come directly to customers' homes or offices. The Connaught Group, Ltd. ("Connaught") used a similar business model to sell women's clothing, but it filed for bankruptcy in 2012. Before the filing, James tried unsuccessfully to purchase Connaught to expand its own direct-sales operation.

The Royal Spirit Group ("Royal Spirit") is a premium apparel supplier headquartered in Hong Kong that serves luxury fashion brands and upscale retailers. Connaught was one of its customers, and Royal Spirit ranked as Connaught's largest trade creditor in bankruptcy. Royal Spirit attempted unsuccessfully to buy Connaught's assets from the estate to carry on its business.

Having failed in their separate acquisition bids, James and Royal Spirit decided to team up. They created the Company to "acquire . . . [Connaught's assets] . . . and operat[e] the Business." Initial LLC Agreement ¶ 2.3(a). Royal Spirit formed WU Parent, a Hong Kong entity, as the vehicle through which it would participate in the joint venture. The Initial LLC Agreement recited that WU Parent and James each contributed $10 million in capital to the Company in return for a 50% member interest. The purchase price for Connaught's assets turned out to be $22.2 million, comprising $20 million in cash plus forgiveness of certain claims by Royal Spirit against the bankruptcy estate. WU Parent and James actually contributed $11.1 million each.

The Initial LLC Agreement established a manager-managed LLC in which the Board served as the sole manager of the Company. The Initial LLC Agreement assigned to the Board the "exclusive responsibility and authority for the conduct of the Company's business, except to the extent that certain matters may be expressly reserved by law or this Agreement to the Members." *Id.* ¶ 4.1(c). It further specified that the Board possessed "overall authority and responsibility for the conduct of the business and affairs of the Company," including "without limitation, all matters that may be granted or delegated to a 'manager' or to a member under the Act." *Id.* ¶ 4.1(a).

3

The Initial LLC Agreement created a Board with four members. WU Parent and James each received the right to appoint two members. *Id.* ¶ 4.1(b). All Board decisions require "unanimous approval." *Id.* ¶ 4.1(d).

WU Parent appointed Thomas Hebestreit and Sze Sum Chu as its designees. *Id.* ¶ 4.1(b). James appointed Sergio Casalena and James Brubaker as its designees. *Id.* Casalena is currently CEO of James; Brubaker was the CFO of James. The Initial LLC Agreement designated Brubaker as CEO of the Company. *Id.* ¶ 4.2(b).

**B.** **WU Parent Transfers Its Interest To WU Sub.**

In early 2012, Royal Spirit analyzed whether, for tax purposes, it should hold its member interest in the Company through a United States-domiciled entity. After exploring the issue internally, Royal Spirit communicated with James about its plan to hold its interest in the Company through a wholly owned subsidiary. Among other communications, James received an email from a Royal Spirit employee dated May 10, 2012, that attached a memorandum analyzing the relevant tax issues. The memorandum contemplated WU Parent forming a wholly owned subsidiary that would act as a "blocker" entity for tax purposes. In response, the Company's CEO, Brubaker, informed Royal Spirit that he had read the memorandum and knew that the "US blocker corporation"—WU Sub—was "already established." From that point on, the Company identified WU Sub as the holder of a 50% member interest in its tax filings. The Company's accountants identified WU Sub as "an equal member of the Company."

During this period, the parties worked on a more detailed LLC agreement (the "Proposed LLC Agreement"). The draft notably referred to WU Sub, not WU Parent, as a

4

member of the Company. The draft contemplated that if an initial member transferred its membership interest to a wholly owned affiliate, then the affiliate would be admitted automatically as a member. The parties did not finalize the Proposed LLC Agreement because their relationship seemed amicable, and business matters took precedence.

## C.     The Relationship Sours.

Disputes initially arose over additional tax planning measures that Royal Spirit advocated. Among other ideas, Royal Spirit suggested transferring the Company's intellectual property to an offshore entity. James agreed at first, then reconsidered.

By 2013, Royal Spirit became concerned that the Company was not performing as anticipated. Royal Spirit proposed hiring a creative director. James disagreed.

In early 2014, Royal Spirit sought to call a Board meeting to consider removing Brubaker as CEO. In a lengthy response, Casalena took the position that neither side had the votes to call a meeting unilaterally. He expressed James' firm opposition to removing Brubaker, hiring a creative director, and transferring the Company's intellectual property to an offshore entity. Casalena asked that Hebestreit and other Royal Spirit representatives stop contacting Brubaker outside of quarterly Board meetings.

Casalena followed up with a letter dated February 10, 2014. His letter made clear that James no longer wished to continue with the parties' joint venture:

> [W]e have also concluded that we do not want to continue in business with you. Your approach to giving advice is unhelpful and often offensive . . . . [T]here is a proper way to discuss differences of opinion and we are not seeing this from you.

> It seems to be a waste of your time and our time to continue to try to persuade each other of our respective points of view regarding the

5

management of the company. If we continue in this way, our mutual investment will be damaged.

Therefore we think that the only sensible course is for one or the other of us to own the company and run it as they see fit.

At December 31, 2013, the book value of Carlisle Etcetera is $23,024,741. Tom James is willing to sell its 50% share to Royal Spirit for its half of the book value, $11,512,371, paid in cash within thirty days. If Royal Spirit is unwilling to buy out Tom James' share, Tom James is willing to buy out Royal Spirit's share at the same price under the same terms.

In an e-mail exchange on May 14, a Royal Spirit representative proposed a more nuanced buyout process, which Brubaker approved.

By May 28, 2014, the parties were drafting an interest purchase agreement to use in connection with a buyout. That document referred to WU Sub as a member of the Company, not WU Parent.

By letter dated July 2, 2014, Royal Spirit informed James that it wished to purchase James' interest in the Company. Discussions quickly stalled. During the negotiations, James told Royal Spirit pointedly that if a deal could not be worked out, Royal Spirit was stuck because James could perpetuate the deadlock and continue operating the Company as it wished.

## D.   This Litigation

On October 24, 2014, WU Sub filed a petition seeking judicial dissolution of the Company because of deadlock at the member and manager levels. The petition named the Company and James as respondents. On November 7, James moved to dismiss on the ground that WU Sub lacked standing to seek a judicial dissolution under Section 18-802

of the LLC Act. WU Sub filed an amended petition on November 13 that added WU Parent as a co-petitioner. James renewed its motion to dismiss.

## II. LEGAL ANALYSIS

James has moved to dismiss the petition pursuant to Rule 12(b)(6) for failure to state a claim on which relief can be granted. In a Delaware state court, the pleading standards under Rule 12(b)(6) "are minimal." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

> When considering a defendant's motion to dismiss, a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.

*Id.* The operative test in a Delaware state court thus is one of "reasonable conceivability." *Id.* This standard asks whether there is a "possibility" of recovery. *Id.* at 537 n.13. The test is more lenient than the federal "plausibility" pleading standard. *Id.* at 537.

James contends that WU Parent and WU Sub lack standing to seek dissolution because (i) Section 18-802 of the LLC Act only permits members and managers to seek dissolution, (ii) neither WU Parent nor WU Sub is a member or manager, and (iii) Section 18-802 is the exclusive extra-contractual method of dissolving an LLC. In my view, James is right on the first two points but wrong on the third.

### A. Statutory Standing To Seek Dissolution Under Section 18-802

Section 18-802 of the LLC Act addresses dissolution. It states that "[o]n application by or for a member or manager the Court of Chancery may decree dissolution

7

of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement." 6 *Del. C.* § 18-802. By its terms, this language limits the right to seek statutory dissolution under Section 18-802 to members and managers of an LLC. As to this issue, James is correct.

## B.      WU Parent And WU Sub's Status As Members Or Managers

To petition for statutory dissolution under Section 18-802, WU Parent and WU Sub must be members or managers of the Company. Neither claims to be a manager. The Initial LLC Agreement makes clear that the Board, acting collectively, is the manager of the Company. WU Parent and WU Sub do claim to be members.

Taking the allegations of the petition as true, WU Parent cannot be a member. WU Parent was a member of the Company, but it assigned its interest to WU Sub. Under Section 18-702(a) of the LLC Act, "[a] limited liability company interest is assignable in whole or in part except as provided in a limited liability company agreement." *Id.* § 18-702(a). The Initial LLC Agreement was silent about assignability, so the interest was freely assignable.

WU Parent lost its status as a member of the Company when it assigned all of its interest in the Company to WU Sub. Under Section 702(b)(3) of the LLC Act, "[u]nless otherwise provided in a limited liability company agreement: . . . (3) [a] member ceases to be a member and to have the power to exercise any rights or powers of a member upon assignment of all of the member's limited liability company interest." *Id.* § 18-702(b)(3). By operation of law, once WU Parent assigned its interest in the Company to WU Sub, WU Parent "cease[d] to be a member" and could no longer exercise a member's right to

8

seek statutory dissolution. *See Eureka VIII LLC v. Niagara Falls Hldgs. LLC*, 899 A.2d 95, 114 (Del. Ch. 2006) (Strine, V.C.) (noting that an assignment "typically results in the statutory divestiture of a membership interest"). Under the facts as pled, WU Parent cannot petition for statutory dissolution.

The analysis for WU Sub is more complex. As an initial matter, James is correct that WU Sub did not automatically become a member by receiving WU Parent's interest. Under Section 18-702(b)(1) of the LLC Act, "[u]nless otherwise provided in a limited liability company agreement: . . . (1) [a]n assignment of a limited liability company interest does not entitle the assignee to become . . . a member." 6 *Del. C.* § 18-702(b)(1). The Initial LLC Agreement did not provide otherwise, so under the facts as pled, the transfer of WU Parent's interest made WU Sub an assignee, not a member.

By default under the LLC Act, only a member can petition for statutory dissolution, not an assignee. Section 18-702(b)(1) reinforces this reading by stating that "[u]nless otherwise provided in a limited liability company agreement: . . . (1) [a]n assignment of a limited liability company interest does not entitle the assignee . . . to exercise any rights or powers of a member." *Id.* § 18-702(b)(1). Section 18-702(a) similarly provides that

> the assignee of a member's limited liability company interest shall have no right to participate in the management of the business and affairs of a limited liability company except as provided in a limited liability company agreement or, unless otherwise provided in the limited liability company agreement, upon the affirmative vote or written consent of all of the members of the limited liability company.

9

*Id.* § 18-702(a). The Initial LLC Agreement did not give assignees the right to seek statutory dissolution. Without more, therefore, WU Sub cannot claim to be a member or exercise the rights of a member, so WU Sub cannot seek statutory dissolution.

But there is more. The petition alleges that WU Sub became a *de facto* member by consent of the parties. Citing Section 18-301(b)(1) of the LLC Act, WU Sub argues that it became a member under the LLC Act once its status as a member was "reflected in the records of the limited liability company." *Id.* § 18-301(b)(1). WU Sub further argues that the tax forms and draft agreements that identified WU Sub as a member were "records of the [Company]." In my view, WU Sub jumps too hastily to this aspect of Section 18-301.

Several sections of the LLC Act bear on the admission of WU Sub as a member. Section 18-101(11) states that the term "'[m]ember' means a person who is admitted to a limited liability company as a member as provided in § 18-301 of this title." *Id.* § 18-101(11). Section 18-301, entitled "Admission of members," addresses a variety of contexts in which persons may become members. Subsection 18-301(b) states:

> After the formation of a limited liability company, a person is admitted as a member of the limited liability company:
>
> . . .
>
> (2) In the case of an assignee of a limited liability company interest, as provided in § 18-704(a) of this title and at the time provided in and upon compliance with the limited liability company agreement or, if the limited liability company agreement does not so provide, when any such person's permitted admission is reflected in the records of the limited liability company.

*Id.* § 18-301(b)(2).

Through this language, Section 18-301(b) distinguishes between (i) the act of admitting an assignee as a member and (ii) the point when the admission becomes effective. First, the assignee must be admitted "as provided in § 18-704(a)." Once this has happened, the admission takes effect "at the time provided on and upon compliance with the limited liability company agreement." The subsection continues with an additional clause that addresses the point when the admission becomes effective if the operating agreement is silent, explaining that in that event, the admission becomes effective "when any such person's permitted admission is reflected in the records of the limited liability company." The phrase "permitted admission" relates back to the first step of the process—admission "as provided in § 18-704(a)"—which indicates that an assignee cannot establish membership simply by pointing to "records of the limited liability company." There must have been a "permitted admission."

The statutory path finishes with Section 18-704(a), which identifies two possibilities for a "permitted admission."

> An assignee of a limited liability company interest may become a member:
>
> (1) As provided in the limited liability company agreement; or
>
> (2) Unless otherwise provided in the limited liability company agreement, upon the affirmative vote or written consent of all of the members of the limited liability company.

6 *Del. C.* § 18-704(a).

The Initial LLC Agreement was silent on the admission of an assignee as a member. Under Section 18-704(a), WU Sub's only route to a "permitted admission" was "upon the affirmative vote or written consent of all of the members of the limited liability

11

company." If that happened, then the "permitted admission" would become effective once WU Sub's admission was "reflected in the records of the limited liability company."

In my view, the reference in Section 18-704(a) to an "affirmative vote or written consent" means the type of formal action of members contemplated by Section 18-302 of the LLC Act, which addresses voting rights. Section 18-302(c) contemplates that action by members will take place at meetings and explains that

> [a] limited liability company agreement may set forth provisions relating to notice of the time, place or purpose of any meeting at which any matter is to be voted on by any members, waiver of any such notice, . . . quorum requirements, voting in person or by proxy, or any other matter with respect to the exercise of any such right to vote.

*Id.* § 18-302(c). Section 18-302(d) contemplates the alternative of members taking action by written consent without a meeting.

> Unless otherwise provided in a limited liability company agreement, on any matter that is to be voted on, consented to or approved by members, the members may take such action without a meeting, without prior notice and without a vote if consented to, in writing or by electronic transmission, by members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted.

*Id.* § 18-302(d). The correspondence between these two methods of action and the language of Section 18-704 leads me to conclude that the latter provision contemplates member action taking one of those forms. The phrase "affirmative vote or written

12

consent" appears rarely in the LLC Act, and other appearances involve similar occasions for formal member action.[1]

The need for formal member action comports with the policies underlying this aspect of the statutory regime. As Chief Justice Strine observed, writing as a Vice Chancellor, "[t]here are likely two motivations for the statutory default rules in §§ 18–702, 18–704(a), and 18–301 concerning the assignment of a limited liability company interest and the assignee's possible (and subsequent) admission as a member of the LLC." *Achaian, Inc. v. Leemon Family LLC*, 25 A.3d 800, 804 n.14 (Del. Ch. 2011). The first was tax-related and is now outdated. The imposition of statutory limitations on the free alienability of LLC member interests formed a critical part of early attempts "to create an entity that, as a matter of tax law, is classified as a partnership with each owner treated as a partner, but whose owners are shielded by state law from automatic personal liability," an effort since rendered superfluous by the Treasury Department's adoption of

---

[1] *See, e.g.,* 6 *Del. C.* § 18-215 (contemplating termination of a series in a series LLC "upon the affirmative vote or written consent of the members of the limited liability company associated with such series"); *id.* § 18-801 (contemplating dissolution "upon the affirmative vote or written consent of the members of the limited liability company"); *id.* § 18-806 (contemplating revocation of dissolution by "affirmative vote or written consent"). Other sections of the LLC Act use the term "written consent" to denote formal company action having legal significance. *See id.* § 18-102(3) (permitting domestic limited liability company to use name similar to that of another entity with permission of other entity in the form of a "written consent" filed with the Delaware Secretary of State); *id.* § 18-304 (identifying circumstances in which a person ceases to be a member "unless otherwise provided in a limited liability company agreement, or with the written consent of all members"); *id.* § 18-904 (permitting foreign limited liability company to use name similar to that of another entity with permission of other entity in the form of a "written consent" filed with the Delaware Secretary of State).

the "check-the-box" tax classification regime. Daniel S. Kleinberger, *Two Decades of "Alternative Entities": From Tax Rationalization Through Alphabet Soup To Contract As Deity*, 14 Fordham J. Corp. & Fin. L. 445, 447-54 (2009). When the LLC Act was drafted, however, the tax implications were significant, so it is logical that the LLC Act would require formal member action to admit an assignee.

"The second reason for the default rules in the [LLC] Act regarding the transferability of [member] interests may rest on the notion that one generally is entitled to select his own business associates in a closely held enterprise, like an LLC." *Achaian,* 25 A.3d at 804 n.14. "The policy that underlies § 18–702(b)(3) is that 'it is far more tolerable to have to suffer a new passive co-investor one did not choose than to endure a new co-manager without consent.'" *Eureka VIII LLC*, 899 A.2d at 115 (quoting *Milford Power Co., LLC v. PDC Milford Power, LLC*, 866 A.2d 738, 760 (Del. Ch. 2004)). It makes sense that the LLC Act would require formal member action to accept a new business partner, rather than contemplating *de facto* membership or the constructive admission of assignees.

In this case, the Company only had two members. Once WU Parent transferred its member interest and WU Sub became an assignee, James was the sole remaining member and controlled the vote on WU Sub's admission. The petition does not plead any formal action by which James voted or acted by written consent to admit WU Sub as a member. Assuming for purposes of analysis that the tax forms and draft agreements were "records" of the LLC for purposes of Section 301(b)(1), there was never a "permitted admission" that could be reflected on those records.

Based on the allegations of the petition, James is correct that WU Sub is not a member who can seek statutory dissolution. Neither petitioner can.

## C. Equitable Standing To Seek Dissolution

James argues that because neither WU Parent nor WU Sub can seek statutory dissolution under Section 18-802, this case must be dismissed. In my view, James errs in contending that Section 18-802 is the exclusive extra-contractual means of obtaining dissolution of an LLC. Under the facts of this case, WU Sub has standing to seek dissolution in equity.

"[T]his Court, as a court of equity, has the power to order the dissolution of a solvent company and appoint a receiver to administer the winding up of those assets." *Weir v. JMACK, Inc.*, 2008 WL 4379592, at *2 (Del. Ch. Sept. 23, 2008). Justice Story described the "power to dissolve the partnership during the term for which it is stipulated" as one of the "strongest cases to illustrate the beneficial operation of the jurisdiction" of a court of equity. 2 Joseph Story, *Commentaries on Equity Jurisprudence* § 915 (W.H. Lyon, Jr. ed., 14th ed. 1918) [hereinafter *Story*]. The implementation of a dissolution decree would require the appointment of a receiver, which is likewise an equitable remedy that forms part of this court's equitable powers.[2] Courts of equity have

---

[2] *See Brill v. Southerland*, 14 A.2d 408, 413 (Del. 1940) (recognizing the court's discretionary power to appoint a receiver); *Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2010 WL 3448227, at *6 (Del. Ch. Sept. 2, 2010) (same); 2 *Story* § 914 ("[I]f necessary, a manager or receiver will be appointed to close the partnership business and make sale of the partnership property."); *see also* Ct. Ch. R. 148 (listing rules applicable to cases in which receivers are appointed "whether such receivers or trustees are appointed pursuant to a statute . . . or pursuant to the inherent authority of the Court").

15

long had the power to appoint receivers in cases "where the partners themselves are wholly unable to agree as to the management of the property and the settlement of the partnership affairs." 4 John Norton Pomeroy, *Equity Jurisprudence* § 1333(1) (Spencer W. Symons ed., 5th ed. 1941) [hereinafter *Pomeroy*]. Justice Story viewed the appointment of a receiver favorably in suits for dissolution when "one [partner] has wrongfully excluded the other from participation" in the management of the business. 2 *Story* § 914 n.1.

For Section 18-802 to provide the exclusive method of dissolving an LLC, it would have to divest this court of a significant aspect of its traditional equitable jurisdiction. Section 18-802 does not state that it establishes an exclusive means to obtain dissolution, nor does it contain language overriding this court's equitable authority. To the contrary, the LLC Act elsewhere recognizes that equity backstops the LLC structure by providing generally that "the rules of law and equity" shall govern in "any case not provided for in this chapter." 6 *Del. C.* § 18-1104.

If Section 18-802 did purport to establish an exclusive means to obtain dissolution and override a significant portion of this court's traditional equitable jurisdiction, then the validity of that aspect of the provision would raise serious constitutional questions. Article IV, Section 10 of the Delaware Constitution provides that this court "shall have all the jurisdiction and powers vested by the laws of this State in the Court of Chancery." Del. Const. art. IV, § 10. The Delaware Supreme Court has held that this provision vested in the Court of Chancery "all the general equity jurisdiction of the High Court of Chancery of Great Britain as it existed prior to the separation of the colonies," except

16

"where a sufficient remedy exists at law." *DuPont v. DuPont*, 85 A.2d 724, 727 (Del. 1951). In light of this provision, the high court held that the General Assembly cannot enact legislation that reduces this court's jurisdiction below the constitutionally established minimum, unless there is an adequate remedy at law. *Id.* at 729. As the Delaware Supreme Court explained, Article IV, Section 10

> intended to establish for the benefit of the people of the state a tribunal to administer the remedies and principles of equity. They secured them for the relief of the people. This conclusion is in complete harmony with the underlying theory of written constitutions. Its result is to establish by the Judiciary Article of the Constitution the irreducible minimum of the judiciary. It secures for the protection of the people an adequate judicial system and removes it from the vagaries of legislative whim.

*Id. See generally* Lyman Johnson, *Delaware's Non-Waivable Duties*, 91 B.U. L. Rev. 701, 702, 716-18 (2011).

Although this court's equitable jurisdiction is measured by the "the general equity jurisdiction of the High Court of Chancery of Great Britain as it existed prior to the separation of the colonies," the Delaware Supreme Court has recognized that the scope of that jurisdiction is not limited by the extent of British scientific, technological, and legal knowledge at the time of the handover. "Historically, equity jurisdiction 'has taken its shape and its substance from the perceived inadequacies of the common law and the changing demands of a developing nation.'" *Schoon v. Smith*, 953 A.2d 196, 204 (Del. 2008) (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court Of Chancery* § 2-2[a], at 2-2 (2006)). "It cannot be said too forcefully that the general powers of the Court of Chancery refers to that *complete system* of equity as administered by the High Court of Chancery of Great Britain."

17

*Glanding v. Indus. Trust Co.*, 45 A.2d 553, 558-59 (Del. 1945) (emphasis added). It is the "complete system" of equity that this court inherited and administers, not the temporally specific subject matter of eighteenth century cases.

To stress this point, the Delaware Supreme Court in *Schoon* quoted from a wide range of sources that demonstrate the continuing and evolving role of equity. The high court started with *Pomeroy:*

> [T]he Chancellor always has had, and always must have, a certain power and freedom of action, not possessed by the courts of law, of adapting the doctrines which he administers. He can extend those doctrines to new relations, and shape his remedies to new circumstances, if the relations and circumstances come within the principles of equity, where a court of law in analogous cases would be powerless to give any relief.

*Id.* at 204-205 (quoting 1 *Pomeroy* § 60). The *Schoon* court similarly quoted from Justice Story, who explained that equity "has an expansive power, to meet new exigencies; and the sole question, applicable to the point of jurisdiction, must from time to time be[ ] whether such rights and wrongs do exist, and whether the remedies [therefore] in other courts, and especially in the courts of common law, are full, and adequate to redress." *Id.* (quoting 1 *Story* § 53). The high court also cited *McClintock on Equity* for the proposition that "the chancellors could adapt their system to meet changing needs without resorting to the fiction that they were merely interpreting and applying former rules, but the tendency to follow the path laid out by former chancellors was strong." *Id.* at 205 (quoting *McClintock on Equity* § 4 (2d ed. 1948)). The *Schoon* court even quoted from *Woolley's Delaware Practice*, which stated:

> It may safely be affirmed that the whole body of equity principles, both of right and remedy, was brought hither by our ancestors, together with the

18

common law, on their emigration from England, as a part of their heritage of liberty. Much of it, no doubt, lay dormant for a long period, no occasion or demand for a resort to portions of it for many purposes having arisen, but gradually as the increasing population of the new country begot new relations, there arose controversies and contests growing out of business, and the necessities for the redress of injuries which resulted from the breach of duties or the non-performance of obligations, that called for the use of the means to enforce observance through ancient remedies.

*Id.* (quoting 1 *Woolley's Delaware Practice* § 56 (1906)).

Given the weight of these authorities, the extensive discussion in *Schoon*, and the decisions in *DuPont* and *Glanding*, I cannot accept the contention that because the nascent practice of entity law as it existed at the time of the colonies' separation had not yet envisioned LLCs, they fall outside the domain of equity.[3] Decisions addressing the dissolution of LLCs have recognized the continuing role of equity.[4] Most notably, in

---

[3] *But see CML V, LLC v. Bax*, 28 A.3d 1037, 1045 (Del. 2011) (distinguishing precedents because the LLC is "a business entity that did not exist in 1792"). Excluding LLCs and other post-eighteenth century entities from the domain of equity based on when the governing statues were adopted would represent a radical form of constitutional originalism that even the strongest judicial proponents of that doctrine have not embraced. Applied by analogy to the United States Constitution, where originalist reasoning has been more prevalent, it would mean that core constitutional protections would not extend to modern technology, such as cell phones or computers, simply because of when they were invented. Even Justices Scalia and Thomas, among the most vigorous champions of originalism, have not gone so far. For example, in 2012, Justice Scalia authored and Justice Thomas joined a decision in which the United States Supreme Court affirmed that the Fourth Amendment's protection against unreasonable searches and seizures applied to evidence obtained by attaching a GPS-based tracking device to a car. *United States v. Jones*, 132 S. Ct. 945 (2012). Justices Scalia and Justice Thomas likewise joined a 2014 decision applying Fourth Amendment protection to cellular phones. *See Riley v. California*, 134 S. Ct. 2473 (2014).

[4] *See, e.g., In re Mobilactive Media, LLC,* 2013 WL 297950, at *33 (Del. Ch. Jan. 25, 2013) (noting that "the Court of Chancery, in the exercise of its equitable powers, *may* decide whether it should issue a decree of dissolution" (emphasis in original)); *Vila*

19

*Haley*, this court reviewed a contractual exit mechanism in a two-member operating agreement and determined that it did not provide the exiting member with "an adequate remedy." 864 A.2d at 88. Chief Justice Strine, writing as a Vice Chancellor, explained that the existence of an exit mechanism was not sufficient; it had to be a "reasonable exit mechanism" that provided "a fair opportunity for the dissenting member who disfavors the inertial status quo to exit." *Id.* at 96. On the facts of the case, the Chief Justice found that it was "not equitable to force [the locked-out member] to use the exit mechanism" and ordered dissolution. *Id.* at 98.

This case also differs from *Bax*, where the Delaware Supreme Court affirmed a decision of this court holding that creditors of an insolvent LLC lacked standing to sue derivatively under Section 18-1002 of the LLC Act. On appeal, the plaintiff-appellant contended that the LLC Act could not deprive the Court of Chancery of jurisdiction to recognize a creditor's standing in equity to sue derivatively. The Delaware Supreme Court rejected that argument for a series of reasons, culminating in its recognition that creditors of an LLC have ample remedies available at law. *Bax*, 28 A.3d at 1046. As Chief Justice Strine had explained while a member of this court, the premise of granting creditors equitable standing to sue derivatively

---

*v. BVWebTies LLC*, 2010 WL 3866098, at *6 (Del. Ch. Oct. 1, 2010) (Strine, V.C.) ("[T]he ultimate determination of whether a decree of dissolution should issue is committed to this court's equitable discretion."); *Haley v. Talcott*, 864 A.2d 86, 98 (Del. Ch. 2004) (declining to consign parties to contractual exit mechanism where it was "not equitable to force [one 50% owner] to use the exit mechanism in this circumstance").

20

is not unproblematic. Arguably, it involves using the law of fiduciary duty to fill gaps that do not exist. Creditors are often protected by strong covenants, liens on assets, and other negotiated contractual protections. The implied covenant of good faith and fair dealing also protects creditors. So does the law of fraudulent conveyance. With these protections, when creditors are unable to prove that a corporation or its directors breached any of the specific legal duties owed to them, one would think that the conceptual room for concluding that the creditors were somehow, nevertheless, injured by inequitable conduct would be extremely small, if extant.

*Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 789-90 (Del. Ch. 2004) (footnotes omitted). In a later decision, then-Vice Chancellor Strine revisited these themes:

Both state law and federal law provide a panoply of remedies in order to protect creditors injured by a wrongful conveyance, including avoidance, attachment, injunctions, appointment of a receiver, and virtually any other relief the circumstances may require. . . . [Further,] financial creditors . . . know how to craft contractual protections that restrict their debtors' use of assets. In a situation when creditors cannot state a claim that such contractual protections have been breached and cannot prove a fraudulent conveyance claim, the creditors' frustration does not mean that there is a gap in the remedial fabric of the business law that equity should fill. Rather, it means that we remain a society that recognizes that reward and risk go together, and that there will be situations when business failure results in both equity and debt-holders losing some money.

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 199 (Del. Ch. 2006) (footnotes omitted), *aff'd sub nom. Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007) (TABLE). The LLC Act provides even more means for a creditor to protect itself at law. *See CML V, LLC v. Bax*, 6 A.3d 238, 250-53 (Del. Ch. 2010) (discussing pertinent statutory sections of LLC Act), *aff'd*, 28 A.3d 1037 (Del. 2011). Thus, to the extent Section 18-1002 limited the right to bring a derivative action to members or

assignees, sufficient remedies for creditors existed at law to avoid any constitutional problem.[5]

This court has held that the parties to an LLC agreement can waive by contract the right to seek statutory dissolution under Section 18-802. *See R&R Capital, LLC v. Buck & Doe Run Valley Farms, LLC*, 2008 WL 3846318, *4 (Del. Ch. Aug. 19, 2008). In my view, the ability to waive dissolution under Section 18-802 does not extend to a party's standing to seek dissolution in equity.

In concluding that parties to an LLC agreement could waive the right to seek dissolution under Section 18-802, the *R&R Capital* decision relied heavily on arguments by commentators to the effect that a Delaware LLC should be viewed as a purely contractual entity to which principles of equity (including fiduciary duties) do not apply.[6] Reasonable minds could disagree about that proposition.[7] But whatever one's personal

---

[5] *Bax*, 28 A.3d at 1046; *see also* 10 *Del. C.* § 342 ("The Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State."); *DuPont*, 85 A.2d at 728 (noting that the jurisdiction that vested in this court at the time of the separation of the colonies did not extend to cases "where a sufficient remedy exists at law").

[6] *See R&R Capital,* 2008 WL 3846318, *4, *7 (citing Myron T. Steele, *Judicial Scrutiny of Fiduciary Duties in Delaware Limited Partnerships and Limited Liability Companies*, 32 Del. J. Corp. L. 1 (2007), and works by Professor Larry Ribstein, including Larry E. Ribstein, *The Uncorporation and Corporate Indeterminacy*, 2009 U. Ill. L. Rev. 131, and Larry E. Ribstein, *An Analysis of the Revised Uniform Limited Liability Company Act*, 3 Va. L. & Bus. Rev. 35, 67 (2008)).

[7] *See Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 849-56 (Del. Ch. 2012) (Strine, C.), *aff'd*, 59 A.3d 1206 (Del. 2012); *see also Feeley v. NHAOCG, LLC*, 62 A.3d 649, 659-63 (Del. Ch. 2012). *See generally* Kleinberger, *supra*, at 460-71

thoughts might have been on the matter, the General Assembly in 2013 adopted an amendment to the LLC Act inconsistent with the purely contractarian view.[8]

Of particular relevance to dissolution, the purely contractarian view discounts core attributes of the LLC that only the sovereign can authorize, such as its separate legal existence, potentially perpetual life, and limited liability for its members. *See* 6 *Del. C.* §§ 18-201, 18-303. To my mind, when a sovereign makes available an entity with attributes that contracting parties cannot grant themselves by agreement, the entity is not purely contractual. Because the entity has taken advantage of benefits that the sovereign has provided, the sovereign retains an interest in that entity. That interest in turn calls for preserving the ability of the sovereign's courts to oversee and, if necessary, dissolve the entity. Put more directly, an LLC agreement is not an exclusively private contract among its members precisely because the LLC has powers that only the State of Delaware can confer. Those powers affect the rights of third parties, who at a minimum must take into account the LLC's separate legal existence and its members' limited liability shield. Just as LLCs are not purely private entities, dissolution is not a purely private affair. It

---

(identifying historical, jurisprudential, and policy reasons why LLCs should not be regarded as purely contractual entities); Sandra K. Miller, *The Best of Both Worlds: Default Fiduciary Duties and Contractual Freedom in Alternative Business Entities,* 39 J. Corp. L. 295, 315-24 (2014) (reviewing empirical studies and presenting data about alternative entity agreements that undermine premises of purely contractarian approach).

[8] *See* H.B. 126, 147th Gen. Assemb. (Del. 2013) (amending 6 *Del. C.* § 18-1104 to provide that "In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern"); Miller, *supra*, at 314 (noting that the debate over the purely contractual status of LLCs "was resolved by legislation that was signed into law on June 30, 2013").

involves third party claims, which have priority in the dissolution process. *See id.* §§ 18-803, 18-804 (describing winding up and priorities for distribution of assets). Because an LLC takes advantage of benefits that the State of Delaware provides, and because dissolution is not an exclusively private matter, the State of Delaware retains an interest in having the Court of Chancery available, when equity demands, to hear a petition to dissolve an LLC. *See In re Revlon, Inc. S'holders Litig.*, 990 A.2d 940, 960 n.8 (Del. Ch. 2010) (noting possibility of including a forum selection clause in an entity's constitutive agreement, but envisioning that "the Delaware courts would retain some measure of inherent residual authority so that entities created under the authority of Delaware law could not wholly exempt themselves from Delaware oversight").

This approach finds support in *Huatuco v. Satellite Healthcare and Satellite Dialysis of Tracy, LLC*, 2013 WL 6460898 (Del. Ch. Dec. 9, 2013), *aff'd*, 93 A.3d 654 (Del. 2014) (ORDER). The *Huatuco* opinion followed *R&R Capital* in holding that the members of an LLC had waived their right to seek statutory dissolution under Section 18-802 when they "specifically considered, and addressed, dissolution and dissolution rights." *Id.* at *5. But the *Huatuco* court reserved decision on "[w]hether the parties may, by contract, divest this Court of its authority to order a dissolution in all circumstances, even where it appears manifest that equity so requires—leaving, for instance, irreconcilable members locked away together forever like some alternative entity version of Sartre's *Huis Clos*." *Id.* at *1 n.2. The *Huatuco* court did not have to answer that question because "considerations fundamental to equity [were] absent." *Id.*

24

This case presents the type of situation anticipated in *Huatuco* where equity should intervene. If the opportunities for dissolution are limited to Section 18-802 and the specific terms of the Initial LLC Agreement, then dissolution is not an option. WU Parent and WU Sub lack standing to seek it, and James does not want it. The Company will continue, with Royal Spirit locked-in as a silent and powerless passive investor.

That situation is contrary to the bargain the parties struck. WU Parent and James formed the Company as equal business partners. They contributed equal amounts of capital and brought comparable expertise, with one side acting as a major supplier and the other as a day-to-day manager. Desiring to seize the opportunity to buy Connaught's assets quickly, they agreed to start with a basic operating agreement in which they committed to negotiate a more detailed replacement agreement. As reflected by the Proposed LLC Agreement, the terms of that more detailed agreement contemplate that an affiliate transfer from WU Parent to WU Sub would result in the automatic admission of WU Sub as a substitute member. In other words, had the parties finalized the Proposed LLC Agreement, or acted in accordance with their agreement in principle, then WU Sub would be a member and have standing to seek dissolution under Section 18-802. Based on the allegations of the petition, WU Parent engaged in the affiliate transfer with James' knowledge and participation, and James subsequently treated WU Sub as a member.

"Equity always attempts to . . . ascertain, uphold, and enforce rights and duties which spring from the *real* relations of parties." 2 *Pomeroy* § 378 (emphasis in original). "[E]quity regards substance rather than form." *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983). Equity also "regards that as done which in good conscience

25

ought to be done." *Id.* The real relationship between the parties is a joint venture in which they are equal participants. Neither party intended to be a "passive investor . . . subject to [the other party's] unilateral dominion." *Haley*, 864 A.2d at 95. In good conscience, WU Sub should be regarded as a member with the power to seek dissolution.

Likewise, the "*real* relations" of the parties point to a scenario warranting dissolution. For a time, both sides recognized the need to go their separate ways. James only changed its mind because of its fortuitous position as the entity's *de facto* manager. But that reality does not make the status quo a satisfactory alternative. "Although the LLC is technically functioning at this point, this operation is purely a residual, inertial status quo that just happens to exclusively benefit one of the 50% members. . . ." *Id.* at 96. The Initial LLC Agreement made the Board the singular manager of the Company. Because its four members are deadlocked, the duly authorized manager of the Company cannot exercise its statutory and contractual authority or carry out its obligation to manage and direct the business and affairs of the entity. Brubaker may be managing the Company because of the power vacuum created by the deadlock, but Brubaker is not the Board. Under the prevailing state of affairs, the Company is operating contrary to the governance structure set forth in its constitutive agreement.

When considering whether holders of equity in other entities can pursue equitable causes of action, despite their lack of formal record ownership status, this court has relied

on the substance of the relationship and permitted the suits to proceed.[9] The same reasoning employed by Chancellor Seitz in *Burry Biscuit* supports recognizing an assignee's standing to sue in equity for dissolution: "Here we have an equitable owner . . . suing in a court of equity," asserting a cause of action that "must in this state be brought in equity," and in a suit that "does involve an equitable remedy." 60 A.2d at 112. Consequently, I believe that WU Sub has standing in equity, as an assignee, to seek dissolution of the Company under the facts alleged in the petition.

### III.     CONCLUSION

WU Parent and WU Sub lack standing to seek statutory dissolution under Section 18-802. Nevertheless, because WU Sub has standing to seek dissolution in equity, the motion to dismiss is denied.

---

[9] *Rosenthal v. Burry Biscuit Corp.*, 60 A.2d 106, 111-12 (Del. Ch. 1948) (Seitz, C.); *accord Gamble-Skogmo v. Saks*, 122 A.2d 120, 121 (Del. 1956); *Jones v. Taylor*, 348 A.2d 188, 190-91 (Del. Ch. 1975); *Brown v. Dolese*, 154 A.2d 233, 239 (Del. Ch. 1959), *aff'd*, 157 A.2d 784 (Del. 1960); *see also In re Lahood,* 2009 WL 803558, *13 n.19 (Bankr. C.D. Ill. 2009) (holding under Illinois law that "[a] transferee of a member's interest has the right to petition a court for an order compelling the dissolution and winding up of a limited liability company on equitable grounds"), *aff'd in pertinent part*, 437 B.R. 330 (C.D. Ill. 2010).